Argued and submitted April 3, resubmitted In Banc June 12, affirmed
December 24, 1996

## RANDOL LAWRENCE PACHL,
*Appellant,*

*v.*

## Carl ZENON,
Superintendent,
Oregon State Correctional Institution,
*Respondent.*

## (91C-12454; CA A88128)

929 P2d 1088

In Banc

Samuel C. Kauffman argued the cause for appellant. With him on the brief were Janet Lee Hoffman and Hoffman & Matasar.

Kaye E. Sunderland, Assistant Attorney General, argued the cause for respondent. With her on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

EDMONDS, J.

Haselton, J., concurring.

**EDMONDS, J.**

Petitioner appeals from a post-conviction judgment denying his request to set aside his conviction for murder. ORS 138.510 *et seq*. We affirm.

Petitioner was convicted by a jury of aiding and abetting a murder. According to the state's theory of the case, petitioner was driving a motor vehicle when Hobson, one of his passengers, decided he needed to "break a knife in." Petitioner drove past the victim, Stanley Reed, as Reed was riding his bicycle, and Hobson stuck the knife out the window and tried to strike Reed with it. Hobson missed, remarking as he looked at the knife, "Oops, no blood," and petitioner turned at the next corner, drove around the block, and waited for Reed to approach his vehicle at the intersection. When Reed proceeded past the vehicle, petitioner edged the car toward Reed. Reed threw down his bike and approached petitioner's vehicle. Hobson got out of the car and chased Reed with the knife, eventually stabbing him twice. Reed later died from the stab wounds.

Petitioner now seeks post-conviction relief, making multiple assignments of error. The subjects of several assignments of error present issues that petitioner could reasonably have been expected to raise at the trial level in the prosecution or on appeal from that conviction. Therefore, we decline to consider those assignments. *Palmer v. State of Oregon*, 318 Or 352, 354, 867 P2d 1368 (1994). The remaining assignments of error assert that petitioner received ineffective assistance of counsel. ORS 138.530(1)(a) requires the court to grant post-conviction relief if there has been

"[a] substantial denial in the proceedings resulting in petitioner's conviction * * * of petitioner's rights under the Constitution of the United States, or under the Constitution of the State of Oregon, or both, and which denial rendered the conviction void."

A substantial denial of constitutional rights occurs if the counsel for a criminal defendant provides ineffective assistance of a constitutional magnitude at trial.

On review of a denial of post-conviction relief, we are bound by the post-conviction court's factual findings, if supported by evidence in the record, but we examine anew its constitutional determinations. *Krummacher v. Gierloff*, 290 Or 867, 869, 627 P2d 458 (1981). To be entitled to post-conviction relief on the basis of inadequate assistance of counsel, petitioner must demonstrate by a preponderance of the evidence that his trial counsel failed to exercise reasonable professional skill and judgment and that he suffered prejudice as a result. *Trujillo v. Maass*, 312 Or 431, 435, 822 P2d 703 (1991). Petitioner first argues that he was denied adequate assistance of counsel because his counsel should have moved to exclude from the courtroom certain spectators who were wearing buttons while his criminal trial was being held.

In that regard, the trial court found and concluded:

"4. Throughout petitioner's criminal trial, persons were present in the courtroom wearing a 'Crime Victims United' button * * *. Such persons numbered between six and twelve at various times during the trial and were generally seated in a 'block' on the side of the courtroom nearest to the jury box and next to the aisle were [*sic*] the jury exited and entered the courtroom. Consequently, all of the jurors saw the button wearers and at least some of the jurors were able to read the button.

"5. A substantial number of spectators who did not display any indicia of identification or affiliation also were present throughout petitioner's trial, and the button wearers did not constitute a majority of the persons in attendance at any time during the trial.

"6. The presence and the conduct of the button wearers during the time the jury was present were under the direct observation of the Court, except on several occasions when the Court met in chambers with petitioner and counsel without declaring a recess. While the button wearers were in the presence of the Court, no disruption or other activity occurred to cause the Court to take any preventive or remedial action with respect to the button wearers or to address any issue related to their presence or conduct.

"* * * * *

"8.   The message printed on the buttons indicated that the button wearers were united in support of the rights of victims of crimes. The message did not accuse the petitioner of having committed the subject crime, nor did it imply that the button wearers had any extra-judicial knowledge or information concerning the petitioner's guilt.

"9.   The CVU buttons were not donned at the end of the trial after the evidence had been presented, so as to imply that the button wearers had concluded from the evidence that the petitioner was guilty. Rather, the button wearers displayed their buttons at the outset of the trial before any evidence was presented and they continued to display the buttons throughout the trial.

"10.   The prosecution did not procure the attendance of the button wearers and was not affiliated with them in any way. Furthermore, during the course of the trial, the button wearers did not have contact with the prosecutor or the State's other representatives in such a manner or to such an extent that the jury reasonably would have inferred the existence of an affiliation between the button wearers and the prosecutor or the State.

"11.   The State's theory of prosecution, and all of the evidence adduced at petitioner's criminal trial, was to the effect that petitioner himself was not the perpetrator of the homicide in question, but rather that petitioner was vicariously liable for the crime because he counseled or aided and abetted another person to commit the homicide. In deciding that issue, the jury was less likely to be influenced by impermissible factors than would have been the case in deciding the guilt or innocence of the actual perpetrator of the subject crime.

"12.   Under the totality of the circumstances of petition's [*sic*] criminal trial, the presence and the conduct of the button wearers did not create an unacceptable risk that the jury would consider factors other than the law and the evidence in determining the issue of petitioner's guilt or innocence, so as to pose an unacceptable threat to petitioner's right to a fair trial and therefore to be inherently prejudicial to the petitioner. Further, petitioner, in fact, was not prejudiced by the presence and conduct of the button wearers at his criminal trial."

During the trial, the victim's wife was seated in the spectator section of the courtroom. Also present in the spectator section during the trial were a number of persons who wore buttons. Throughout the trial, defense counsel made numerous motions for mistrial. After the jury had been instructed and the case had been submitted to them, counsel called petitioner's stepmother to the witness stand and elicited the following testimony:

"Q   And you're Randy's stepmother?

"A   Yes.

"Q   You have been sitting in the courtroom since you were permitted to come back in, is that right?

"A   Yes.

"Q   And have you observed some people wearing big round buttons?

"A   Yes.

"Q   Do you recall what they say on them?

"A   'CCVU,' Citizen Crime Victims United.

"Q   And how many people have been sitting back in the court with buttons?

"A   Oh, gosh, probably a dozen at least, or more.

"Q   In and out?

"A   Yes.

"Q   How big are the buttons?

"A   They're about the size — this thick.

"Q   You're indicating a couple inches across?

"A   Yes.

"Q   Are they sitting close enough to the jurors so the jurors can see them?

"A   Yes.

"Q   Now, what occurred today regarding some of those people who were the people you're talking about and what did you see them do?

"A   While you were out, while you went into chambers for a discussion, the older woman with blondish colored hair, I believe wearing a tan dress, and a tall gentleman in a gray suit with silver gray hair wearing the buttons, went to leave the courtroom and as they left, they passed the victim's wife and she put her arms around her and consoled her with members of the jury staring right at them, and when they left, more members of the group left, a woman probably in her mid-40's and another gentleman sitting on the end of the bench that the victim's wife was sitting on, patted her head and consoled her and left in plain view of the jury.

"Q   So the four of them went through this bit in front of the jury?

"A   Also one of them came up when you were in chambers from the back of the room, a black woman who's been in here, she's probably in her 30's, came up and talked with the victim's wife with her arm around her shoulder while the jury was watching.

"Q   Was she wearing a button?

"A   No.

"* * * * *

"[Petitioner's trial counsel:]   Of course, this is the victim's wife, Mrs. Reed, who's sitting here all the time, so if the Court permits her to come back in, I would ask that you deny anybody else that activity.

"* * * * *

"[Petitioner's trial counsel:]   I'd appreciate, Your Honor, having the opportunity to have this evidence in the record at this time and in all probability pursue it, but I don't precisely know how yet, so I'd appreciate the opportunity to make a record."

After the jury returned a verdict of guilty, defense counsel moved for a new trial including the ground that there was misconduct by victim's advocates in the courtroom. According to the motion, "[t]his misconduct involved efforts on the parts of spectators to arouse sympathy for a witness who testified and for the wife of the victim." In support of his motion for a new trial, petitioner offered evidence that there were 7 to 12 CVU members present daily during the trial, that they sat in the rows nearest to the jury and that CVU

members had comforted the victim's wife by patting her on the back.

Petitioner argues that his trial counsel should have objected to the presence of the button-wearing spectators in the courtroom during the trial. He contends that the message on the buttons denied him a fair trial and that his counsel failed to exercise reasonable professional judgment when he did not object. He concedes that he cannot prove actual prejudice because of the message but argues that the message on their buttons was so inherently prejudicial that the jury was necessarily influenced. Defendant counters that petitioner's argument improperly assumes that an objection or a motion for a mistrial was the only reasonable decision that counsel could have made. According to defendant, "it is entirely possible that trial counsel believed that * * * the presence of the button wearers was not particularly harmful to petitioner's chances at trial" or "petitioner stood as good a chance of obtaining a favorable verdict at this trial as he would at any other [in the event, a mistrial was granted]."

■■ The Oregon Constitution does not guarantee a perfect defense to a criminal defendant, and there are no clearly defined standards for determining the adequacy of counsel. Also, reasonable people can differ as to whether a particular motion or objection is necessary or what constitutes meaningful tactical strategy. Obviously, spurious motions or "scatter gun" approaches to trial advocacy detract from the effectiveness of the presentation of a defense. It is apparent from trial counsel's comments after he finished the examination of petitioner's stepmother that he deliberately chose not to make a motion for a mistrial at that time.

In *Krummacher*, the court noted the difficulty that lies in assessing how reasonably competent counsel should act in a particular circumstance. The court stated:

"Criminal charges and trials are so variable that effective trial court advocacy involves not only the performance of specific tasks, but also the exercise of art and professional judgment. Any formulation of a standard must take into

account the remarkable variety of effective advocacy displayed daily in our trial courts by competent lawyers of differing approach, style, personality, temperament, and strategic inclinations. Because cases, lawyers, judges and juries vary, because defendants and crimes vary, and because communities vary, the application of any standard, however stated, to individual cases necessarily involves a degree of subjectivity and ad hoc judgment. * * *

"Certain duties of counsel can only be described generally. * * * [Those duties do] not require that the lawyer must automatically do the defendant's bidding in all respects or otherwise suspend the operation of professional ethics and judgment. Nor does it require that he expend time and energy uselessly or for negligible potential benefit under the circumstances of the case. Rather, it requires that the lawyer do those things reasonably necessary to diligently and conscientiously advance the defense.

"* * * * *

"The form of acceptable advocacy varies from case to case. In some cases, the recommendation of a guilty plea may be to the defendant's advantage; in others, counsel will deem it advisable to put the state to its proof, offer a multitude of defenses, or offer the one seemingly strongest defense. In any case, the strategy, tactics, and manner of advocacy of the defense are for counsel to determine based upon the exercise of professional skill and judgment. The constitution gives no defendant the right to a perfect defense—seldom does a lawyer walk away from a trial without thinking of something that might have been done differently or that he would have preferred to have avoided. Adequacy of assistance of counsel allows for errors which are inconsequential in the context of the entire trial or proceeding. *It also allows for tactical choices that backfire, because, by their nature, trials often involve risk*. Moreover, a risk which is foolish in a close case may be sound where the prosecution is strong and the defense weak. Errors which result from a failure to use the professional skill and judgment for which the lawyer is employed cannot be characterized as tactical choices. In other words, if counsel exercises reasonable professional skill and judgment, a reviewing court will not second-guess the lawyer in the name of the constitution, but neither will the court ignore decisions made in the conduct of the

defense which reflect an absence or suspension of professional skill and judgment." 290 Or at 873-76 (citations and footnotes omitted; emphasis supplied).

In this case, there are several possible inferences that could be drawn from counsel's decision to defer any motion for a mistrial that could be commensurate with the exercise of adequate constitutional assistance of counsel. The overriding theme of petitioner's defense was that he was not aware that Hobson intended to assault the victim and that he was in the wrong place at the wrong time. Petitioner testified at his criminal trial that he thought Hobson "was just joking around," when Hobson initially tried to hit the victim with the knife, and that he did not seriously consider Hobson's statements about getting blood on the knife because Hobson "was a lot of hot air. He talks a lot and you learn to ignore [him.]" On closing argument, petitioner's counsel told the jury in part,

"I suspect and strongly suspect that at a jury trial Hobson would be found guilty of murder and that his actions are not justifiable, but that's not the case we're here to try. You're here trying Randol Pachl, a young man who has had 20 people from all walks of life come here and tell you about him, family and friends, people who he's known all his life. He is a good person. He's a truthful person. He's tried to tell the truth and he's not guilty of murder. * * * Don't convict him because of this horrible thing that Hobson did."

It is apparent that petitioner's trial strategy was to separate himself from the culpability of his companion by demonstrating that he was an uninvolved, law abiding citizen. He did not seriously contest that a crime had occurred, only his involvement in it. The message of the button expressed generic support to all victims of crimes, a message with which petitioner presumably would have agreed in the light of his defense. It behooves any trial counsel to present a consistent defense throughout a jury trial, given the weaknesses and opportunities for attacks by an opponent that inconsistent and "scatter gun" positions provide. Petitioner's counsel's decision not to move for a mistrial on the ground that the buttons' message expressed support for the crime victim is entirely consistent with his overall trial strategy. Even if that was not counsel's motivation in not moving for a mistrial or to exclude the buttons, we are left to speculate on

this record as to why counsel did nothing more than to make a record about the spectators.

In this post-conviction relief proceeding, petitioner has the burden of demonstrating that his counsel's decision not to object or move for a mistrial was a deviation from the standard of reasonable professional judgment that any reasonable counsel would have exercised as distinguished from a tactical decision. It is not an error of constitutional magnitude to choose a trial tactic that is not successful, and this is the kind of case on which reasonable minds could differ as to the appropriate legal strategy. We conclude that, on this record, petitioner has not carried his burden of persuasion in that regard.[1]

The concurrence would hold that trial counsel's inaction breached the standard of competent professional representation but that the possibility of prejudice falls short of demonstrating "a tendency to affect the result of the prosecution." 145 Or App at 364 (quoting *Stevens v. State of Oregon*, 322 Or 101, 110, 902 P2d 1137 (1995), which held that not all lapses of professional skill and judgment entitle a defendant to post-conviction relief but only those acts or omissions by counsel which have a tendency to affect the result of prosecution are of constitutional magnitude). The concurrence's reasoning in the context of this case suffers from a defect. The concurrence states, "[A]lthough the buttons were hardly neutral, they were *relatively* benign[.]" 145 Or App at 371. (Emphasis in original.) Apparently the concurrence would hold that criminal defense attorneys have the professional obligation to object to events in the courtroom

---

[1] We are not, by our opinion, indicating that the wearing of buttons by spectators in a trial could never deprive a defendant of a fair trial. A fair trial occurs when the verdict is based on the evidence and not on factors external to the proof at trial. *Holbrook v. Flynn*, 475 US 560, 89 L Ed 2d 525, 106 S Ct 1340 (1986). External factors fall into two categories. Some influences are inherently prejudicial to a fair trial because they present an unacceptable risk of prejudice. Such practices are permitted only when justified by an essential state interest. Other influences require the defendant to show actual prejudice in order to obtain post-conviction relief. Petitioner relies on *State v. Franklin*, 174 W Va 469, 327 SE2d 449 (1985), and *Norris v. Risley*, 918 F2d 828 (9th Cir 1990). In those cases the buttons proclaimed public outcry for convictions in the particular cases being tried and the effect of their messages was unavoidable in causing the jury to consider factors other than the evidence and the law of the case. The message of the buttons in this case does not rise to the level of being inherently prejudicial.

that have a "benign" or favorable effect on a fair trial. Moreover, that reasoning is inconsistent with the settled legal test about when external factors prevent a fair trial. Under circumstances where influences in the courtroom are so inherently prejudicial that a fair trial is at risk, the test for prejudice is met as a matter of law if exclusion does not occur. If the buttons' appearance in the courtroom posed a significant threat to a fair trial such that an objection was necessary (as the concurrence asserts), it necessarily follows that the buttons were inherently prejudicial and, thus, had a tendency to affect the result of the prosecution. Thus, the issues about whether trial counsel should have objected in the exercise of reasonable professional skill and judgment and whether the buttons had a tendency to influence a jury improperly become one and the same if, in fact, the constitution required counsel to object and he failed to do so. Petitioner's entitlement to post-conviction relief necessarily follows if counsel should have objected as claimed by the concurrence. Nonetheless, petitioner's failure of proof lies not in the proof of prejudice but in the proof that his counsel failed to exercise reasonable professional skill and judgment.

Petitioner also maintains that the proximity of the spectators wearing the buttons to the jury box inherently affected the jury's ability to determine his guilt or innocence based on the evidence. Although the record is unclear as to the precise distance that the front row of the spectators area is from the jury box, there is a photograph in the record from which it could be inferred that the spectators in this case were as close to the jury as the demonstrators were to the jury in *Norris*, in which the Ninth Circuit concluded that the buttons in that case were inherently prejudicial. *See Norris v. Risley*, 918 F2d 828 (9th Cir 1990). However, that fact by itself is not determinative. There is nothing in the record or that we have found in our research that suggests that there is a required "constitutional" distance between the jury box and the spectators' area. Again, the distance between the button wearers and the jury is only one factor to be considered in the totality of the circumstances. Moreover, in every trial, the potential exists of the presence of spectators who may have some type of a social identity with the victim of the crime. *See, e.g., State v. Richey*, 171 W Va 342, 298 SE2d 879, 889

(1982) (holding that the defendant's right to a fair trial was not impaired when, in a sexual assault case involving a high school student victim, her peers seated themselves in the courtroom to give her support). Again, each case must be decided on its own facts. Presumably trial counsel was aware of the proximity of the spectators to the jury box and considered that fact along with the messages of the buttons. For whatever reason, he chose not to pursue any remedy because of those facts and for the reasons expressed earlier in the opinion, petitioner has not demonstrated that counsel's non-action was other than a tactical decision.

■     Petitioner also argues that his counsel's failure to object "to the court's holding of chamber conferences without excusing the jury and while the state's key witness was seated in the witness box" constituted ineffective assistance of counsel. During the state's examination of Wendy Rogers, a witness who had been a passenger in petitioner's vehicle when the stabbing occurred, counsel asked to be heard outside the presence of the jury. The court and counsel retired to chambers without excusing the jury. During that time, the state's victim assistance representative approached Rogers on the witness stand, patted her, gave her a tissue, and apparently whispered words of encouragement to her that the jury was unable to hear. When he learned of the occurrences, petitioner's counsel moved for a mistrial, arguing that the representative's conduct constituted improper prosecutorial vouching. The court then questioned each juror about what each had seen and heard. All of the jurors said they saw the representative approach the witness, and a few jurors assumed that the person was a friend of Rogers. None of the jurors heard what the state's representative said to Rogers. Moreover, the representative did not sit with the prosecution at counsel table or in any other way demonstrate an affiliation with the prosecution in front of the jury.

Petitioner argues that his trial counsel should have objected when the trial court left the jury in the jury box with Rogers on the witness stand. Again, we disagree. The time that the representative spent with the witness was relatively brief. According to the record, the jurors had no idea who the representative was, nor did they hear anything that either

the representative or Rogers said. We conclude that petitioner has not carried his burden of proof on this assignment either.

■ Petitioner's final argument is that trial counsel's alleged failure to prepare him for cross-examination constituted ineffective assistance of counsel. The evidence from the post-conviction hearing indicates that most of defendant's contact with counsel occurred through another attorney in counsel's office and a private investigator, both of whom were assisting counsel with petitioner's case. Counsel also personally spoke with petitioner before the criminal trial. There is evidence that petitioner, his counsel and his representatives discussed petitioner's version of the facts, and counsel stated in an affidavit that he was confident that he understood petitioner's version.

Nevertheless, petitioner argues that counsel did not exercise reasonable skill because he did not coach him on how to respond to cross-examination, and as a result, he was nervous and was not able to convey properly the relationship he had with Hobson. The post-conviction court evaluated the testimony of petitioner at trial and the degree of astuteness demonstrated by petitioner in responding to questions on both direct and cross-examination. It concluded that any lack of preparation of petitioner as a witness "did not constitute an absence * * * of professional skill or judgment." There is evidence to support the trial court's conclusion. From the record, it is apparent that petitioner was able to explain his version of the facts without difficulty. Beyond that, petitioner's expectations are unclear to us. In fact, "coaching" a witness could, under certain circumstances, suggest an ethical violation by counsel. We conclude that petitioner did not prove by a preponderance of the evidence that counsel's failure to prepare him for cross-examination constituted ineffective assistance of counsel. For all of the reasons stated, the trial court did not err in denying petitioner relief from his conviction.

Affirmed.

**HASELTON, J.,** concurring.

I write separately to express my disagreement with the lead opinion's analysis of defense counsel's failure to

object to the spectators' buttons. Specifically, unlike the majority, I believe that counsel's failure to object to the buttons breached the standard of competent professional representation. Nevertheless, petitioner did not demonstrate that that breach had such "a tendency to affect the result of the prosecution" to warrant post-conviction relief. *Stevens v. State of Oregon*, 322 Or 101, 110, 902 P2d 1137 (1995) (original emphasis deleted). Accordingly, I concur.

In *Stevens*, the court described petitioner's burden in demonstrating constitutionally inadequate assistance of counsel for purposes of Article I, section 11, of the Oregon Constitution. First,

"a petitioner must show 'by a preponderance of the evidence, facts demonstrating that trial counsel failed to exercise reasonable professional skill and judgment[.]' " *Id.* at 108 (quoting *Trujillo v. Maass*, 312 Or 431, 435, 822 P2d 703 (1991)).

Second, if defense counsel's conduct breached the standard of professional representation, petitioner must show prejudice of constitutional magnitude—that is, that counsel's advice, acts, or omissions had "*a tendency to affect the result* of the prosecution." *Id.* at 110 (emphasis in original).

The first aspect of that cumulative inquiry is distinct from the second. Consequently, counsel may breach the standard of professional representation, even if the consequence of that breach is not so prejudicial as to warrant post-conviction relief. In other words, and most simply, there can be instances in which, because of a *possibility* of prejudice, criminal trial counsel is obligated to act even if, ultimately, his or her failure to do so did not "[tend] to affect the result of the prosecution." *Id.* at 110 (original emphasis deleted).

This is such a case. Here, from the outset of the trial, between six and 12 spectators wearing two-inch wide buttons, bearing the legend "C.V.U." and "Crime Victims United," sat in a block of seats closest to the jury and immediately adjacent to the aisle by which the jury entered and left the courtroom. The buttons were clearly visible to the jury. On at least one occasion, several of the button-wearing spectators embraced and expressed support to the victim's

widow in the jury's presence. Other spectators, including attorneys who were not participants in the case, immediately noticed the presence of the buttons and were concerned about their potentially prejudicial impact.[1]

Nevertheless, defense counsel did nothing—until the sixth day of trial, after all evidence had been presented and the case had been submitted to the jury. *See* 145 Or App at 355-56 (quoting colloquy). At that point, long after the potentially prejudicial "horse" had bolted, counsel suggested that he might at least try to bar the door—and then didn't. Subsequently, defense counsel filed a motion for a new trial that was predicated, in part, on the presence of the buttons in the courtroom,[2] and the court denied that motion.

In the circumstances of this case, regardless of the ultimate demonstrable "tendency" to affect the jury's verdict, the exercise of reasonable professional skill and judgment compelled a timely objection to the buttons, out of the jury's presence. Bluntly: Competent criminal defense counsel would have raised such an *in limine* objection at the beginning of trial. That is not a matter of uncharitably "second-guessing" trial counsel's performance from a distance of months or years. *See Krummacher v. Gierloff*, 290 Or 867, 875, 627 P2d 458 (1981) ("[I]f counsel exercises reasonable professional skill and judgment, a reviewing court will not second-guess the lawyer in the name of the constitution[.]"). It is, instead, a matter of acknowledging that, where there was some possibility of prejudice from the buttons and there

---

[1] One of those spectators, an attorney who specializes in real estate and construction law, testified that the button wearers were a "significant" and identifiable group in the courtroom and that he had the "impression * * * that it was the entire courtroom versus the defendant in that trial. The playing field was a little tilted." Another spectator, an investigator with the metropolitan public defender's office, stated that the persons wearing buttons "kind of hung together; sort of reminded me of maybe a rooting section, if you will. Pretty obvious, pretty—pretty obvious."

[2] Defendant's new trial motion in the criminal proceeding asserted, in part:

"Defendant was denied a fair trial because of the misconduct of others in the courtroom which materially affected the jurors and interfered with the proper verdict. This misconduct involved efforts on the parts of spectators to arouse sympathy for witnesses who testified and for the wife of the victim."

In support of that motion, defendant proffered affidavits of various spectators recounting their observations of the buttons in the courtroom and of the button wearers' conduct.

were no countervailing tactical or strategic considerations, competent defense counsel would have objected. *Id.* at 875-76 ("[B]ut neither will the court ignore decisions made in the conduct of the defense which reflect an absence or suspension of professional skill and judgment.").

Here, there was a *possibility* of prejudice. The buttons' legend, "Crime Victims United," did not comment directly on the specific crime charged, murder.[3] Nevertheless, the buttons communicated the spectators' belief that a *crime* had occurred, and the button-wearers' presence at petitioner's trial conveyed their further belief that *petitioner had committed it*. Any other characterization of the buttons, or of the spectators' presence, blinks reality.

Petitioner proffered compelling evidence that, given that potential prejudice, trial counsel's inaction with respect to the buttons was deficient. The statements of Charles Crookham, Marc Blackman, and Robert McCrea are exemplary. Crookham, who served for 26 years as a trial judge, including eight years as presiding judge of the Multnomah County Circuit Court, and who later served as Oregon's Attorney General, explained the potential prejudice:

> "Well, the button is designed to convey an impression to someone that these are people supporting crime victims, and it's certainly very visible.
>
> "* * * * *
>
> "And it's sort of a cheering section is what it amounts to. And it's, again, vouching, and these people are vouching for the prosection witnesses. * * * [W]hen you come down the aisle and here are a series—and I understood it was estimated at up to a dozen—you certainly have a conveying of something to the jury that has to do with guilt or innocence or sympathy for the victim."

Crookham further expressed his opinion that, because of the potential prejudice, the trial court, even without an objection by counsel, should have removed the buttons:

---

[3] *Compare, e.g., State v. Franklin,* 327 SE2d 449 (W Va 1985) (spectators at drunk driving trial wore buttons reading "MADD," *i.e.,* "Mothers Against Drunk Driving"); *Norris v. Risely,* 918 F2d 828 (9th Cir 1990) (spectators in rape trial wore buttons reading "Women Against Rape").

"Q [By petitioner's counsel] On a practical level, in your opinion, just as the trial judge or a trial judge, who had the duty there to get rid of the buttons?

"A Well, first of all, the judge does because he's ultimately responsible for everything that occurs in the course of the trial. And so you have a choice of saying to people, we won't have that, or we won't have picket signs, or anything else like that. I'm not going to tell you you can't do it in the hallways or out in front because that's not before me. But I can certainly dampen that and give them a choice of removing the button or staying outside. But I think that if the judge is aware of what those signs are, and not every judge has 20/20 vision, something is apparent when all these people are wearing it. Just like a uniform, it conveys something."

Crookham opined, finally, that if the trial judge had not previously removed the buttons on his or her own motion, defense counsel had a duty to make such motion promptly.

Blackman, a former president of the Multnomah County Bar Association, who has specialized in criminal cases for over 20 years, including serving for four years as a prosecutor with the United States Attorney's Office, opined that:

"effective trial counsel would have raised the issue of the impropriety of allowing button wearing spectators to attend Mr. Pachl's trial before the jurors had been exposed to them and the trial court would have granted the relief of prohibiting spectators from wearing such buttons. * * * If trial counsel did not become aware of the presence of button wearing spectators until after the jury had been exposed to them, then it is my opinion that this indicates ineffective assistance of counsel, because it is incumbent on counsel to be aware of things occurring in the courtroom that would prejudice his or her client's right to a fair trial.

"But even if immediate lack of awareness is excusable, effective counsel would have moved for relief immediately upon becoming aware that spectators were wearing such buttons and I believe to a reasonable legal certainty that had counsel immediately sought relief, the court would have granted it. The relief an effective defense lawyer would have sought was a mistrial, which the trial court may well have granted if made early enough in the proceeding.

But even if the court refused to grant a mistrial, it is my opinion to a reasonable legal certainty that the trial court would have granted relief from the continued display of such buttons and would further have sought to cure the harm already done by inquiring of the jurors whether their exposure to the spectators might affect the performance of their duties, and instructing them that the display of the buttons was improper and was to be completely disregarded by them."

McCrea, who has practiced criminal law for nearly 40 years in this state, including serving as a prosecutor with the Lane County District Attorney's Office for over seven years, testified that "absolutely" the first thing defense counsel should have done was ask to have the buttons removed:

"Q  [By petitioner's counsel] And how soon into the trial should he have moved for that?

"A  As soon as he was aware that the persons were there with the buttons. Before the jury was even impaneled if he was aware of it at that time. In other words, it's not a situation where he wants to wait until the jury sees the buttons and have them removed. What one wants to do is avoid it ever happening, if possible.

"Q  And again, the difficulty with the button wearers is?

"A  The buttons are a form of communication. It is in essence tantamount to persons holding up signs in the courtroom as to what their position is concerning what should happen. It's not directly stated on the button what they believe should happen, but it's not that subtle either. Any person would reasonably interpret what these persons—what their sentiments are concerning what should happen. And that fact that they talked in terms of victim means that they believe there is a victim. And if there's a victim, that means someone has victimized the person or in essence committed a crime."

The possibility of prejudice was manifest.[4]

---

[4] In so stating, I do not minimize or denigrate the importance of participation by complainants and victims' rights groups in our system of criminal justice. Moreover, the public's right to attend criminal trials is manifest. Nevertheless, those considerations do not override a defendant's right to a fair trial.

Conversely, there was no plausible reason for failing to object. There was no "downside" to objecting, and there was nothing to gain from failing to object. The lead opinion posits various theories as to why defense counsel might not have objected. *See* 145 Or App at 359-60. Those theories are flawed in at least five respects. First, the state did not adduce testimony by defense counsel explaining his inaction. Thus, the rationales the lead opinion posits are entirely speculative and conjectural. Significantly, defense counsel *did* submit an affidavit in the post-conviction proceeding rebutting petitioner's other allegations of inadequate assistance, but that affidavit did not mention, much less explain, counsel's inaction as to the buttons.

Second, counsel's silence with respect to the buttons is unsurprising because, after trial, the same attorney moved for a new trial, in part because of the buttons: If, as the lead opinion suggests, the presence of the buttons was "entirely consistent" with counsel's "overall trial strategy"—a "consistency" that counsel himself never asserted—counsel could not, presumably, have moved in good faith for a new trial based, in part, on the "[denial] of a fair trial" because of "misconduct" involving "efforts on the parts of spectators to arouse sympathy * * * for the wife of the victim."

Third, the lead opinion is based on the premise that the defense advanced a consistent "overall" "overriding" trial strategy, by which he attempted to "separate himself from the culpability of his companions" and "did not seriously contest that a crime had occurred, only his involvement in it." That premise is wrong. Although defendant did advance the theory the lead opinion suggests, he also advanced others— including, most significantly, the proposition that his companion's use of deadly physical force was justified by the decedent's aggressive and threatening conduct. In particular, defendant requested and received lengthy self-defense instructions that provided, in part:

> "Therefore, if you find that Stanley Reed [the decedent] was about to use or threatened to use physical force against Brian Hobson [defendant's companion] in the commission of a felony, or Stanley Reed was using or about to use unlawful deadly physical force against Brian Hobson, then you may find that Brian Hobson was acting in self-defense

by using deadly physical force against Stanley Reed. A finding that Brian Hobson was acting in self-defense would allow you to find that Randy Pachl was also acting in self-defense."

During closing argument, defense counsel argued extensively about notions of justification and self-defense.

There is no possible "consistency" between a justification defense and a characterization of the decedent as a "victim." Indeed, defense counsel alluded to that in closing argument: "Whenever we talk about Mr. Reed as the 'victim,' * * * perhaps that's not true." Thus, counsel's failure to object to the buttons cannot be laid at the door of a coherent trial strategy.

Fourth, the lead opinion's assessment of counsel's supposed unexplained "tactical" decision pertains solely to counsel's failure to move for a mistrial on the sixth day of trial. *See* 145 Or App at 359-60. That focus impermissibly narrows the scope of petitioner's claim of inadequate assistance[5] and does not explain any plausible tactical or strategic reason for failing to move *in limine* at the beginning of trial to exclude the buttons.

Fifth, the suggestion that petitioner "presumably would have agreed with" the buttons' message—*i.e.*, "generic support [for] all victims of crimes," *see* 145 Or App at 359—is, with all respect, specious. Presumably, the same could be said of any extraneous message in any criminal trial in which a defendant asserts his or her innocence. By that reasoning, if the defendant in a murder case relied on an alibi or misidentification defense, spectators could freely display buttons and placards bearing the picture of the decedent with the legends, "Her Death Must Be Avenged" and "Her Killer Must Be

---

[5] The petition for post-conviction relief alleges, in part, that petitioner was denied effective assistance of counsel, due process, and a fair trial because criminal defense counsel

"[f]ailed to adequately protect defendant's rights to a fair trial and due process of law by failing to object to the presence of numerous victim's advocates in the courtroom at the trial. On petitioner's personal knowledge, during the trial, a number of individuals wearing buttons prominently identifying them as members of a victim's advocacy organization were present in the courtroom. * * * It does not appear from the record that trial counsel ever moved the court to exclude these individuals or require them to remove their buttons."

Punished." The inescapable truth is that petitioner here, like the hypothetical defendant, had nothing to gain by having the buttons before the jury.

In sum, the buttons had some possibility of prejudicing the jury, and there were no plausible countervailing considerations for keeping the buttons before the jury. Given that cost/benefit balance, competent trial counsel would have objected. Thus, defense counsel's silence breached the standard of competent representation.[6]

Nevertheless, on this record, the *possibility* of prejudice, which required an objection, fell short of the *"tendency"* required for post-conviction relief. Assuming that some extraneous messages in some courtroom context can be so inflammatory as to be deemed presumptively prejudicial for post-conviction purposes, the circumstances of this case did not cross that "structural error"-like threshold. Although the buttons' message clearly aligned the wearers with the prosecution, that message, as the post-conviction court observed, "did not accuse the petitioner of having committed the subject crime, nor did it imply that the button wearers had any extra-judicial knowledge or information concerning the petitioner's guilt." Thus, although the buttons were hardly neutral, they were *relatively* benign, even given the wearers' proximity to the jury. *Accord Franklin*, 327 SE2d 449; *Norris*, 918 F2d 828 (both described in note 3 above).

Without the benefit of some "structural error"-like presumption of prejudice, it was incumbent on petitioner, as the proponent of post-conviction relief, to prove affirmatively that the content and proximity of the buttons' message, when coupled with the wearers' conduct, had the requisite impermissible "tendency to affect" the jury's verdict. Despite post-conviction counsel's best efforts, I believe that petitioner did not meet that burden. Without further and unnecessary amplification, my conclusion in that regard is based on the

---

[6] The lead opinion's assertion that counsel is obligated to object only if "the buttons were so inherently prejudicial" as to preclude a fair trial, 145 Or App at 360-61, impermissibly conflates and equates breach of the standard of representation and prejudice. That is, it suggests that counsel is required to act only when an actionable "tendency to affect" the verdict is manifest. That analysis cannot be squared with Oregon's post-conviction methodology. *See, e.g., Stevens*, 322 Or 101, and *Krummacher*, 290 Or 867, described at 145 Or App at 364-65.

criminal trial record, including the strength of the state's case, and the circumstances of the buttons' display, as found by the post-conviction court. Accordingly, I concur that petitioner is not entitled to post-conviction relief based on his counsel's failure to challenge the spectators' buttons.

Riggs, Landau, Leeson, and Armstrong, JJ., join in this concurring opinion.