Argued and submitted January 7, reversed April 21, 1981

# KRUMMACHER,
*Petitioner/Respondent,*

*v.*

# GIERLOFF,
*Respondent/Petitioner.*

## (TC 103613, CA 13105, SC 27308)

627 P2d 458

Rodney K. Norton, Assistant Attorney General, Salem, argued the cause for petitioner. On the brief were James A. Redden, Attorney General, Walter L. Barrie, Solicitor General, and James M. Brown, Assistant Attorney General, Salem.

Dale Drake, Salem, and William J. Tway, Boise, Idaho, argued the cause for respondent. With them on the brief were Anton Hohler and Faber F. Tway, Boise, Idaho.

TANZER, J.

**TANZER, J.**

Petitioner seeks postconviction relief from her conviction of murder, contending that she was denied various constitutional rights, and particularly her right to counsel. The trial court denied relief, but the Court of Appeals reversed the order and required a new trial. We allowed review to examine the standard by which denial of the constitutional right to counsel is to be adjudged.

Petitioner was convicted of the 1968 murder of her parents-in-law, Herbert and Dorothy Krummacher. On direct appeal, a divided department of the Court of Appeals reversed the judgment for insufficiency of evidence. *State v. Krummacher,* 15 Or App 234, 515 P2d 412 (1973). On review, this court, over the dissent of three of its members, concluded that the evidence of guilt was sufficient to support the verdict. We therefore reversed the Court of Appeals' decision and reinstated the convictions. *State v. Krummacher,* 269 Or 125, 523 P2d 1009 (1974). The proof was circumstantial and the evidence extensive. The facts are detailed in our earlier opinion and will be repeated here only as necessary. In essence, the jury necessarily believed that the victims were murdered with a gun of a rare type and bullets of a rare type to which only petitioner and her husband had access, that her husband was innocent, and that plaintiff was therefore guilty.

In this postconviction relief proceeding, petitioner primarily contends that numerous acts and omissions by her appointed attorneys constitute a denial of counsel. The trial court, upon a finding that "the representation by her trial attorneys was informed, knowledgeable, competent and effective under the circumstances," denied relief. Insofar as the findings relate to historic facts, they are binding on appeal; as they give constitutional characterization to the facts, we are bound by the implied historical findings, but we must reexamine the constitutional determinations. *State v. Warner,* 284 Or 147, 585 P2d 681 (1978); *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968).

The Court of Appeals addressed one of those contentions. It held that the failure of defense counsel to develop and present certain evidence suggesting a murder/suicide theory (i.e. that Herbert Krummacher killed

Dorothy Krummacher and then committed suicide) was a failure to adequately present a defense, thus denying petitioner the effective assistance of counsel. In so holding, the Court of Appeals relied upon its earlier opinion in *Rook v. Cupp,* 18 Or App 608, 526 P2d 605 (1974).

The most recent decisions from this court enunciating a standard for the evaluation of the constitutionally requisite degree of assistance of counsel express and apply the so-called "farce and mockery of justice" test. In order to prevail under that standard, it is necessary for a convicted person to show that appointed counsel was so incompetent or inefficient as to make the trial a farce or a mockery of justice. *Benson v. Gladden,* 242 Or 132, 140-141, 407 P2d 634 (1965). *See also State v. Abel,* 241 Or 465, 406 P2d 902 (1965), and *North v. Cupp,* 254 Or 451, 461 P2d 271 (1969). That standard has been accurately criticized as vague and subjective in form and as an overly modest description of tolerable representation and it has been abandoned by several courts. *See, e.g.,* Comment, *Effective Counsel,* 59 Neb L Rev 1040, 1050 (1980). Nevertheless, this court has not expressly varied from the "farce and mockery" standard.

In *Rook v. Cupp, supra,* the Court of Appeals observed that some other "Courts have begun to question whether the 'farce or mockery of justice' standard can continue to survive," 18 Or App at 611. It surveyed decisions from other jurisdictions and ignored the standard which this court had historically propounded. After review of the federal circuits, the Court of Appeals adopted the standard expressed by the Supreme Court of West Virginia:

" 'Where a counsel's performance, attacked as ineffective, arises from occurrences involving strategy, tactics and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, unless no reasonably qualified defense attorney would have so acted in the defense of an accused.' *State v. Thomas,* 203 SE2d 445, 461 (W Va 1974).

"This brings into consideration counsel's skills as a lawyer and applies a test of reasonableness under the circumstances. We adopt that test. It does not change the rule that a petitioner has the burden of producing evidence

supporting the claim of incompetence—*Benson v. Gladden,* 242 Or 132, 407 P2d 634 (1965), *cert denied* 384 US 908 (1966); *Storms v. Cupp,* supra; *Cole v. Cupp,* 3 Or App 616, 475 P2d 428, Sup Ct *review denied* (1970)—and it includes the thought that if any shown incompetence had no effect on the outcome of the case it will be treated as harmless. *Storms v. Cupp,* supra; *State v. Goddard,* 5 Or App 454, 485 P2d 650 (1971)."

18 Or App at 612-613 (footnote omitted). We agree with the Court of Appeals that the phrase "farce and mockery of justice" can no longer be deemed adequate to describe the quality of representation to which a defendant is constitutionally entitled and we no longer restrict the constitutional assurance of counsel to that standard.

The shift of scrutiny in recent cases from the rudiments of the trial to the quality of representation by counsel reflects a shift from the general requirements of the due process clause of the Fourteenth Amendment to the United States Constitution to the more specific constitutional right to counsel. There is recognition that counsel's performance may be inadequate without the trial, if any, having been reduced to a sham. *People v. Pope,* 23 Cal 3d 412, 152 Cal Rptr 732, 590 P2d 859 (1979).

Petitioner claims under the right to counsel provisions of both the state and federal constitutions. The relevant provisions of those documents are worded differently, but embody similar objectives. It is sufficient for purposes of this case to examine the right to counsel as if the rights assured under each constitution are identical.[1]

Article I, section 11, of the Oregon Constitution provides:

"In all criminal prosecutions, the accused shall have the right * * * to be heard by himself and counsel * * *."

---

[1] That assumption may be reexamined in the event that the United States Supreme Court interprets the federal right in a manner which is inconsistent with our interpretation of the requirements of the two parallel constitutional provisions. To date, the United States Supreme Court has not settled on a particular formulation. That most often quoted is that counsel's performance must be within the "range of competence demanded of attorneys in criminal cases." *McMann v. Richardson,* 397 US 759 at 771, 90 S Ct 1441, 25 L Ed 2d 763 (1970). *See also Tollett v. Henderson,* 411 US 258 at 268, 93 S Ct 1602, 36 L Ed 2d 235 (1973).

The sixth amendment to the constitution of the United States provides:

> "In all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence." ·

■■ The mere act of appointment of counsel to represent an indigent accused is obviously not sufficient to provide the protection afforded by these constitutional provisions.[2] Rather, the provisions call for an adequate performance by counsel of those functions of professional assistance which an accused person relies upon counsel to perform on his behalf.[3] Any standard formulated to effectuate these constitutional guaranties should focus on the adequacy of the attorney's performance rather than upon the general competency of the lawyer. Lawyers, like other professionals, are not all equally skillful, but the least of us can sometimes rise to a challenge and the best of us can blunder. Thus it is the performance, not the identity, of the defense lawyer which is subject to constitutional scrutiny.

The formulations of constitutional standards for performance of counsel which we have found tend to be as subject as the "farce and mockery" standard to the criticism that they are imprecise and capable only of subjective application. This is true of those statements surveyed in *Rook v. Cupp* and of those expressed in cases decided subsequent to that: *See, e.g.,* counsel "reasonably likely to render and does in fact render reasonably effective assistance under the facts and circumstances," *Wilson v. Cowan,* 578 F2d 166, 168 (6th Cir 1977); "not errorless counsel and not counsel judged ineffective by hindsight, but counsel reasonably likely to render and rendering reasonably effective assistance," *Gaines v. Hopper,* 575 F2d 1147, 1149 (5th Cir 1978); in the negative, "counsel failed to render reasonably effective assistance and the result was a denial of

---

[2] This case gives us no occasion to reconsider whether a conviction based upon substandard performance by retained counsel is a denial of counsel under these provisions. *See Shipman v. Gladden,* 253 Or 192, 453 P2d 921 (1969).

[3] In this sense, the term "adequate" assistance of counsel may be more accurate than "effective" assistance of counsel. Counsel cannot always be effective, but they must always be "adequate" to the task. *See U.S. v. DeCoster,* 487 F2d 1197 (DC Cir 1973), concurring and dissenting opinion of MacKinnon, J., at 1205.

fundamental fairness," *U.S. v. Elksnis,* 528 F2d 236, 238 (9th Cir 1975); professional performance reflecting "the customary skill and knowledge which normally prevails at the time and place," *U.S. ex rel Johnson v. Johnson,* 531 F2d 169, 174 (3d Cir 1976) *cert den* 425 US 997; "competent assistance of counsel acting as a diligent, conscientious advocate," *Dunker v. Vinzant,* 505 F2d 503 (1st Cir 1974) *cer den* 421 US 1003; "reasonably competent assistance of counsel acting as a diligent, conscientious advocate," *U.S. v. Moore,* 554 F2d 1086 (DC Cir 1976), *see also U.S. v. DeCoster, supra,* at 1203-1204; counsel's action cannot be "so 'horribly inept' as to amount to a 'breach of his legal duty faithfully to represent his client's interests,'" *U.S. v. Reincke,* 383 F2d 129, 132 (2d cir 1967); "good-faith representation with all the skill which counsel possesses," *Hickock v. Crouse,* 334 F2d 95, 100-101 (10th Cir 1964), *cert den* 379 US 982 (1965). *See also,* Annot: *Adequate Representation by Counsel,* 2 ALR4th 27.[4]

We conclude from a review of the cases and from our own analysis that any statement of the standard of performance constitutionally required of counsel must necessarily be general and that a degree of subjectivity in application cannot be avoided. Criminal charges and trials are so variable that effective trial court advocacy involves not only the performance of specific tasks, but also the exercise of art and professional judgment. Any formulation of a standard must take into account the remarkable variety of effective advocacy displayed daily in our trial courts by competent lawyers of differing approach, style, personality, temperament, and strategic inclinations. Because cases, lawyers, judges and juries vary, because defendants and crimes vary, and because communities vary, the application of any standard, however stated, to

---

[4] Some courts have adopted lists of lawyers' tasks such as those stated in the American Bar Association Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function, Approved Draft 1971, but this checklist approach does not necessarily measure whether a particular defense has been adequately advocated. *See U.S. v. Moore,* 554 F2d 1086 (DC Cir 1976), dissenting opinion of Robb, J. For example, a failure of counsel to confer regularly with his client may cause anxiety and is below accepted professional performance standards, but such a failure does not necessarily affect the quality of the defense.

individual cases necessarily involves a degree of subjectivity and ad hoc judgment.[5] The search for a single, succinctly-stated standard, objectively applicable to every case, is a fool's errand. It is preferable to examine the duties and functions to be performed and to articulate and specify our expectations as we are called upon to examine the actual performance of those duties and functions.

■ Certain duties of counsel can only be described generally. For example, adequate assistance of counsel requires the lawyer's devotion to the interests of the defendant. That devotion must be undivided, *cf. Glasser v. U.S.,* 315 US 60, 62 S Ct 457, 86 L Ed 680 (1942); *Holloway v. Arkansas,* 435 US 475, 98 S Ct 1173, 55 L Ed 2d 426 (1978). It does not require that the lawyer must automatically do the defendant's bidding in all respects or otherwise suspend the operation of professional ethics and judgment. Nor does it require that he expend time and energy uselessly or for negligible potential benefit under the circumstances of the case. Rather, it requires that the lawyer do those things reasonably necessary to diligently and conscientiously advance the defense.

■■ The performance of certain other functions may be capable of relatively objective assessment. For example, counsel who fails to file notice of appeal within the permissible time has not provided the quality of assistance of counsel which is constitutionally required. *Shipman v. Gladden, supra.* At a somewhat less measurable level, counsel's functions include informing the defendant, in a manner and to the extent appropriate to the circumstances and to the defendant's level of understanding, of the existence and consequences of nontactical choices which are the defendant's to make, so as to assure that the defendant makes such choices intelligently. This function of counsel

---

[5] "The courts continue to reach for appropriate standards. There is a transition from the older standards to articulation of stricter but equally vague standards of performance. However, * * * the standards articulated for measuring ineffective counsel may be necessarily and intentionally vague. This is probably one of those areas of the law, so rich in variables, in which the courts wish to avoid imposing rigid rules and probably could not devise a rigid list if they attempted to do so. The result leaves maneuvering room for the courts as they seek, in applying the standards, to assess each claim in the totality of the circumstances." Strazzella, *Ineffective Assistance of Counsel Claims: New Uses, New Problems,* 19 Ariz L Rev 443, 454 (1977).

is particularly important when a defendant is called upon to waive fundamental rights, as by a guilty plea or waiver of jury trial, *see, e.g., Turner v. Cupp,* 49 Or App 671, 619 P2d 1357 (1980).

■ This case involves the type of attorneys' functions which is most difficult to evaluate for constitutional adequacy, those performed in the course of representing a defendant at trial. Some general propositions may be stated, but their application to individual cases must necessarily be somewhat subjective. For example, counsel must investigate the facts and prepare himself on the law to the extent appropriate to the nature and complexity of the case so that he is equipped to advise his client, exercise professional judgment and represent the defendant in an informed manner.

■ The right of a defendant to be heard by counsel requires at least that counsel advocate the defense with professional skill and judgment. The form of acceptable advocacy varies from case to case. In some cases, the recommendation of a guilty plea may be to the defendant's advantage; in others, counsel will deem it advisable to put the state to its proof, offer a multitude of defenses, or offer the one seemingly strongest defense. In any case, the strategy, tactics, and manner of advocacy of the defense are for counsel to determine based upon the exercise of professional skill and judgment. The constitution gives no defendant the right to a perfect defense—seldom does a lawyer walk away from a trial without thinking of something that might have been done differently or that he would have preferred to have avoided. Adequacy of assistance of counsel allows for errors which are inconsequential in the context of the entire trial or proceeding. It also allows for tactical choices that backfire, because, by their nature, trials often involve risk. Moreover, a risk which is foolish in a close case may be sound where the prosecution is strong and the defense weak. Errors which result from a failure to use the professional skill and judgment for which the lawyer is employed cannot be characterized as tactical choices. In other words, if counsel exercises reasonable professional skill and judgment, a reviewing court will not second-guess the lawyer in the name of the constitution, but neither will the court ignore decisions made in the

conduct of the defense which reflect an absence or suspension of professional skill and judgment.

The Court of Appeals concluded that petitioner had been denied effective assistance of counsel because trial counsel[6] had not pursued with sufficient vigor certain evidence which suggested that Herbert Krummacher murdered Dorothy Krummacher and then committed suicide. Trial counsel's omission should be evaluated in the context of the evidence at trial (most of which was known to counsel prior to trial) which reflected upon the likelihood of murder and suicide.[7]

Herbert and Dorothy Krummacher were discovered in their residence approximately three days after their deaths from gunshot wounds. Dorothy was in bed in the upstairs bedroom. Her body and head were covered with a blanket. Her face and neck had been washed of blood to the clavical. She bore three bullet entry wounds and two exit wounds. Death was caused by the bullet which severed the aorta and remained in the body. She died immediately.

Herbert was found in a puddle of blood on the floor in the downstairs bedroom. The bedroom door was open four or five inches and swung freely. He was fully clothed and his face was covered with a small towel or washcloth. His body had one bullet entry wound. The bullet entered the chest slightly to the right of center and followed a path slightly downward and leftward. It penetrated the right pulmonary artery, causing fatal bleeding, and exited Herbert's body. The bullet was never found.

No gun, bullets, or empty shellcasings (other than the bullet lodged in Dorothy's body) were found inside or outside the house, although metal detection equipment was used. There was a hole on the inside of the back kitchen door, which appeared to have been made by a removed 38-caliber slug. All of the doors and windows which could be opened were closed and locked.

---

[6] Two lawyers were appointed to represent petitioner. One served as lead counsel and testified at the postconviction hearing. For convenience, all single references are to lead counsel.

[7] This review of the evidence at trial borrows liberally from the petition for review. Its accuracy as a partial statement of trial evidence is not disputed.

There were traces of blood on the back of the upstairs bathroom sink and on the inside of the front and back doors. There was also a smear on the wall of the stairs. The amounts of blood were so small that the Oregon State Police crime lab personnel were unable to identify any of the blood's characteristics. No other blood was found inside or outside the house.

The State Medical Examiner, Dr. Russell Henry, performed autopsies on both victims. He testified that Herbert could have remained conscious for no more than ten minutes after being shot and that he might have walked ten to twenty feet, such as from one room to another, but that he could not have walked up a flight of stairs. Dr. Henry testified that the internal and external bleeding from Herbert's wounds would have been profuse and rapid.

The defense pathologist, Dr. William Lehman, testified from the autopsy report and from Dr. Henry's testimony that Herbert might have remained conscious for ten or fifteen minutes and have walked one-half a block, if it was flat. Dr. Lehman testified that Herbert could have climbed a flight of stairs and that he was capable of making rational decisions.

Trial counsel testified at the postconviction relief hearing that his basic strategy was to put the state to its proof and to argue the existence of reasonable doubt wherever that proof was arguably deficient. The keystone of the prosecution was the evidence which linked the bullet in Dorothy Krummacher's body to the bullets and gun to which the petitioner had access. To prove that link, the state relied upon tests performed at Oregon State University utilizing a newly developed technological method called neutron activation analysis.

Conversely, the keystone of the defense was to attack and minimize that critical state's evidence. Defense counsel identified and located one of the world's leading experts on the process, communicating with him by telephone and cablegram, and was able thereby to severely restrict the scope of the conclusions which the state elicited from the neutron activation expert who performed the tests

on the fatal bullet and to weaken the persuasiveness of that testimony.[8]

Defense counsel regarded it as strategically unsound to dilute the effect of his credible attack on the

[8] The prosecuting attorney testified:

"A His handling of that [neutron activation analysis] part of the case was outstanding. He was ahead of me at all times. One thing that he did is he found and retained the services of the world's leading expert in that area. In fact, they had to find him in South America on a luxury tour. The defense witness was a man who had invented neutron activation analysis and his credentials were outstanding.

"At the beginning of the case, I had a witness who was willing to testify rightly or wrongly and I couldn't tell the difference.
 * * * * *
"* * * At the beginning of the case, the state's expert was willing to testify that in his opinion based upon the data he had accumulated from his work in the lab, the bullet found in Dorothy Krummacher's body came from a box of bullets available to the defendant. When the case came to trial, he was still willing to so testify. He also was willing to testify that in his scientific expert opinion, based upon an assumed question of some of the evidence, that the probabilities that the bullet came from the box were about 97.5 just using some relatively simple statistic of principles which he explained to me and I have since forgotten.

"He was also willing to testify based on hypothetical questions as to the statistical probability that anyone would have a .38-caliber Iver-Johnson pistol of the type used in this case and upon the statistical probabilities, that a person would have .38-caliber S & W copper wash bullets of the type that was used or rather the type that was found in the body of Dorothy Krummacher.

"When this evidence started to come in in the course of trial, there was an objection by Delbert Mayer [defense counsel] and he asked for an in camera hearing. By the time the in camera hearing was over, he had demonstrated not only to the Court's satisfaction but to my satisfaction that probability of it is based upon statistics was inadmissible, inappropriate evidence. He had several cases plus a Harvard Law Review article to that effect.

"He had also demonstrated so much knowledge with respect to what Dr. Goodwin was likely going to testify to, that I recognized that having my witness testify that the bullet from the body of Dorothy Krummacher came from the box of bullets that the defendant had available was going to make my expert look a little silly when Dr. Goodwin got through testifying. So as a result of that, I had to limit his testimony so that my experts would be substantially consistent with the testimony of Dr. Goodwin.

"That's what I did for tactical reasons because I didn't want to look bad and counsel, that is Judge Mayer, was obviously going to make him look bad because he was completely and totally on top of the whole thing. Much more so than I was."

The trial prosecutor further testified that earlier he had been forced to seek a postponement for further testing, that defense counsel nearly succeeded in having the case dismissed and that petitioner was released on her recognizance (an unusual occurrence in a murder case, see *State ex rel Haynes v. Burks*, 290 Or 75, 619 P2d 632 (1980)) during the continuance.

state's evidence by asserting a theory of defense which was not credible. He regarded the murder/suicide theory as noncredible. He testified in the postconviction proceeding that:

> "* * * the more we investigated this possibility of murder/suicide, the more difficult that was — well, that would be something that was very difficult to stand up and argue to a jury with a straight face. It would be even tougher to sit there and listen to the district attorney tear you apart in closing. There were some real — some very real problems with that theory."

Those problems are evident from the record. The defense investigation failed to produce any evidence to suggest that Herbert Krummacher had access to a gun such as that which fired the shot into Dorothy Krummacher or to bullets of the rare type which was used. There might have been time after having shot Dorothy Krummacher for Herbert to have washed the basin and walls, washed and covered Dorothy, and retrieved from the wall or the outside grounds the bullets which traveled through her. Defense counsel decided that it would have been problematical, however, to try to persuade the jury that Herbert Krummacher, after killing Dorothy, shot himself at a difficult angle, apparently by pulling the trigger with his thumb, and then, while bleeding rapidly and profusely from his severed pulmonary artery, retrieved the bullet either from the wall or from the grounds outside the house, disposed of the gun, cartridge and slug somewhere beyond the perimeter of the house which was searched by metal detectors, returned to the house, closed and locked the door, laid himself down on the bedroom floor, spread a small towel over his face and died in a puddle of blood, all without having dripped any blood elsewhere on the floor or the outside area. As defense counsel testified:

> " * * * you don't have to think about it very long before it becomes rather difficult to believe you could stand in front of a jury and argue with a straight face that the man shot himself and then put the towel over his face. * * *"[9]

---

[9] The prosecutor testified that he regarded the murder/suicide theory as "probably the worst possible defense in this case" and a "delightful theory" for a prosecutor to contradict.

Defense counsel testified that he decided the better strategy regarding the murder/suicide theory was to suggest it to the jury as a possible reasonable doubt, along with other possible doubts, but not to advance the theory so strongly that it would motivate the prosecutor to respond fully.

The Court of Appeals disagreed with that tactical decision. It concluded that the failure of defense counsel to more fully develop the murder/suicide theory rendered defense counsel so ineffective as to have denied petitioner the right to counsel. Specifically, the Court of Appeals looked to the evidence of Dr. Henry, the State Medical Examiner. There was a reference in Dr. Henry's autopsy report, but not in his testimony, to the possibility of powder burns in the clothing of the victims. Powder in the clothing was significant, the Court of Appeals reasoned, in light of the testimony of the defense pathologist that powder burns on clothing and powder on the hands, if any is shown by a paraffin test, would "suggest" suicide. The Court of Appeals concluded that defense counsel's failure to cross-examine Dr. Henry regarding gunpowder in the clothing and to introduce the autopsy report to contradict him if necessary was a failure to exploit a defense, i.e. reasonable doubt based on the possibility of murder/suicide.

That reasoning was erroneous in several respects. First, the Court of Appeals observed that the jury was not informed that "exactly such a finding [of powder burns on the body] was made in the autopsy performed on Herbert Krummacher." To the contrary, the autopsy report contained no such finding. It merely reported an impression:

"No distinct powder stains can be distinguished, however, one gains the impression that there is powder residue in the blood.

* * * * *

"There was a contact ring here and an impression of powder staining."

In other words, the autopsy report simply reported initial impressionistic observations. Gross examination suggested the possibility of powder burns in the clothing, but, contrary to the Court of Appeals' statement, the report recited no such "finding." In fact, subsequent examination of the

clothing at the Oregon State Police Crime Laboratory disclosed the presence of no gunpowder. This was mentioned at trial and the district attorney was prepared to call laboratory personnel to so prove.[10]

Second, defense counsel made a reasoned tactical decision in merely suggesting the possibility of murder/-suicide strongly enough to possibly impress a juror but not strongly enough to generate a response from the district attorney. Consistent with that approach, he did not question Dr. Henry further. That would have allowed Dr. Henry to explain. Instead, he elicited from the defense pathologist that a paraffin test to determine the existence of gunpowder on the hands of Herbert Krummacher should have been a routinely performed test because powder on the hand and powder on the clothing would suggest suicide. He further elicited that such a test was not performed. He then dropped the subject until argument.

Defense counsel's tactical choice was based upon reason and professional judgment. It may be that another lawyer would have tried the case differently; it may be that a reviewing court would disagree with that counsel's decision. It may even be that, in hindsight, the decision was an error. In the context of this trial, however, we cannot agree that defense counsel's decision not to more fully develop the murder/suicide theory by examination and evidence regarding impressions of non-existent powder burns constituted a suspension of professional representation which denied petitioner her constitutionally due assistance of counsel. The Court of Appeals' conclusion as to this assignment of error is therefore erroneous.

Petitioner raised several other assignments of error, each involving an act or omission of trial counsel which petitioner contended should have led the trial court to find that counsel was ineffective. She also makes some claims regarding rights other than that to counsel. These

---

[10] Petitioner contended in the Court of Appeals that the failure to object to this testimony as hearsay was another denial of effective assistance of counsel. The defense counsel had no reason to object because he was not asserting murder/suicide as a theory. Moreover, the lab report indicated that first-hand evidence to the same facts was available to the state and it was his intention not to trigger a larger degree of proof from the state.

contentions were argued in this court, the briefs are before us, and our examination of the murder/suicide contention prepares us to also address the revived issues. *Compare Washington Square v. First Lady Beauty Salons,* 290 Or 753, 625 P2d 1311 (1981), and *Falk v. Amsberry,* 290 Or 839, 626 P2d 362 (1981). We have examined each pleaded claim and we find them to be unsubstantial. Rather than discuss each one, we shall discuss a few illustrative claims.

■ Petitioner contends that counsel was ineffective in failing to object to a leading question calling for a speculative answer. She sets out his testimony from the postconviction hearing which contains both the question and answer from the trial transcript and the testimony of defense counsel at the hearing:

"Q You recall then that Mr. Pinnick [of the Oregon State Police laboratory] was asked that just taking the .38 S&W ammunition, the kind that will fire from this kind of gun, what proportion — how much of that ammunition would be .38-caliber Western lubaloy?

"A I remember.

"Q And what was his answer?

"A 'Now, I would hesitate to guess.'

"Q And then the next question?

"A "All right. Would it be more than one out of five?"

"Q And the answer?

"A 'No.'

"Q You did not object?

"A No.

"Q Did you make a conscious decision not to object to that question?

"A No.

"Q So it wasn't a tactical decision at all; you just missed it; is that right?

"A Yes.

"Q Did you realize at the time that the question was leading and asked the witness to speculate and called for a conclusion?

"A I don't have any recollection of what happened — of this happening. I just know that what I read here now, that I could have objected."

Defense counsel also testified that he did not remember the particular instance, but that his failure to object was consistent with his general practice:

"Q When you try a case, does the fact that leading questions in and of themselves are asked on direct examination mean anything to you on the other side?

"A No, unless something's coming in that is hurting, let them lead.

"Q Uh-huh. And in their case, did you follow that practice?

"A Basically, that's my general — has always been my general practice.

"Q Is that a tactical decision on your part?

"A Yes. It's a question of moving along and I think at times, you look sort of foolish to the jury jumping up and down on some of these things that really don't mean anything."

Although some other lawyers might do it differently, we agree with the finding of the trial court that the failure to object did not constitute a denial of assistance of counsel. Our agreement is for two reasons. First, we deem it reasonable for a lawyer to conclude that it does not damage his case if his opponent elicits admissible evidence by leading questions and he objects only when it is important. Second, only those acts or omissions by counsel which have a tendency to affect the result of the prosecution can be regarded as of constitutional magnitude, and this omission was inconsequential.

Petitioner also contends that she was denied the assistance of counsel because counsel failed to move for a change of venue because of extensive publicity about the crime in Tillamook County where it was committed. Defense counsel testified that he regarded his familiarity with the community and his access to information about potential jurors as an advantage he would have in choosing a Tillamook County jury which he would not have elsewhere. He also testified to some other reasons, but that reason alone represents a considered professional judgment which no court should second guess.

There are other contentions on appeal that failure to make certain motions to suppress and to dismiss and to raise certain matters on appeal were also instances of

denial of assistance of counsel, but the constitution does not require counsel to make useless and futile gestures for the sake of form. None of these contentions are substantial and there is no reason to burden the reports with further discussion.

Plaintiff persuasively demonstrated that other competent criminal defense lawyers would have tried petitioner's case differently. Perhaps another lawyer could have won for petitioner; perhaps not. It is her actual lawyers' performance which is in issue, however, not that of a hypothetical lawyer. The record of this case also demonstrates persuasively that, although they lost a close case, petitioner's counsel served her with diligence, sacrifice, intelligence and sound professional judgment. Neither constitution requires more.

The order of the trial court is without error.

Reversed.