Argued and submitted October 17, 2002, affirmed January 29, 2003

## RICKY HARRIS,
### *Appellant,*
### *v.*
## Mitch MORROW,
### Superintendent,
### Oregon State Penitentiary,
### *Respondent.*
### 99C-10354; A111936

63 P3d 581

Steven H. Gorham argued the cause and filed the brief for appellant.

Steven R. Powers, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Linder and Wollheim, Judges.

HASELTON, P. J.

**HASELTON, P. J.**

Petitioner appeals from a judgment denying him post-conviction relief from his conviction for murder with a firearm. ORS 163.115; ORS 161.610. Petitioner argues that the post-conviction court applied a legally improper prejudice standard to his inadequate assistance of counsel claim and, as a result, erroneously concluded that his trial attorney's failure to impeach an important state witness with a video-taped interview did not have a tendency to affect the result of his trial. We conclude that the post-conviction court's recitation of the prejudice standard is, ultimately, fundamentally consistent with our formulation in *Horn v. Hill*, 180 Or App 139, 41 P3d 1127 (2002). We further conclude that petitioner's trial counsel's omission, when considered in light of the totality of the evidence presented at trial, did not have a tendency to affect the result of the case. Consequently, we affirm.

Petitioner was charged with murder with a firearm, ORS 163.115 and ORS 161.610, and his case was tried to a jury in January 1995. Because petitioner admitted that he shot and killed the victim, David Nolen, the central issue at trial was petitioner's intent. The prosecutor argued that petitioner was guilty of intentional murder. Petitioner contended that the shooting was accidental and that, at most, he was guilty of one of the less serious offenses of criminally negligent homicide or manslaughter.

One of the state's key witnesses was petitioner's long-term girlfriend, Karen Harris, who testified that she saw petitioner release the gun's safety, put the gun up between Nolen's eyes, and shoot him in the head. In contrast, petitioner testified that the gun had accidentally discharged while he was spinning it, "cowboy-style," on his finger. The jury convicted petitioner of murder with a firearm, and the court sentenced him as a dangerous offender to a 30-year indeterminate sentence. On direct appeal, we affirmed from the bench. *State v. Harris*, 141 Or App 599, 920 P2d 180, *rev den*, 324 Or 323 (1996).

In 1999, petitioner brought this action for post-conviction relief, alleging that his trial counsel had been deficient in many ways. Of particular significance to our review, petitioner asserted that his trial counsel was constitutionally inadequate for failing to obtain and review a copy of a video-taped interview that Harris had given on a local television broadcast and in failing to impeach Harris with key statements in that interview. In the interview, Harris stated repeatedly that the shooting had been an accident:

> "The way that I was always brought up, that you're * * * innocent until proven guilty, well it is now, in this case, is guilty until proven innocent. He didn't intentionally murder that kid. It was an accidental shooting, that's all there was to it. And they got him booked as intentional murder, and he didn't intend to murder nobody.

> "Today is the ninth day that he hasn't been eating because of the inhumane treatment that he is receiving down there. * * * He's been going days and days at a time without medicine and he is supposed to be on his pain medicine and anti-depressants, and no medicine to keep his wits about hi[m]self. He's goes days and days at a time, and they refuse to take him to a doctor.

> "There ain't never been no problems with Davey. * * * It's just a freak accident."

Petitioner argued that Harris was a material witness against him; that her characterization of the shooting as "accidental" in the interview flatly contradicted—and, thus, dramatically would have impeached—her trial testimony, which graphically described the shooting as intentional; and that, consequently, counsel's default in failing to review and use the videotape as impeachment had a tendency to affect the result of the trial. The post-conviction court rejected all of petitioner's specifications that defense counsel had been deficient, with one exception—the failure to impeach Harris. With respect to that allegation, the court held that petitioner's trial counsel was "plainly ineffective" for failing to obtain and use the tape on cross-examination. Nevertheless, the court concluded that petitioner was not entitled to post-conviction relief because he had failed to establish that he had been actionably prejudiced by counsel's default:

"It is apparent that the television videotape would have had some tendency to affect the outcome of the trial. But, there was a great deal of other evidence pointing to the guilt of the petitioner, including the testimony of petitioner's daughter and several other adamant eyewitnesses. Placed in this context, it is doubtful that the failure to obtain and use the tape at trial is likely to have changed the actual outcome of the jury's decision in this case. Petitioner failed to prove that proper utilization of the tape could have affected the outcome, under the totality of the circumstances. Therefore petitioner was not 'prejudiced' in the legal sense by his trial counsel's inadequate performance."

In reviewing the decision of the post-conviction court, we are bound by its factual findings that are supported by evidence in the record. *Horn*, 180 Or App at 141 (citing *Krummacher v. Gierloff*, 290 Or 867, 869, 627 P2d 458 (1981), and *Martinez v. Baldwin*, 157 Or App 280, 282, 972 P2d 367 (1998), *rev den*, 329 Or 10 (1999)). We review the court's legal conclusions for errors of law. *Ashley v. Hoyt*, 139 Or App 385, 391, 912 P2d 393 (1996).

On appeal, petitioner raises two principal arguments. First, petitioner asserts that the post-conviction court applied a legally erroneous standard of actionable prejudice for post-conviction relief, and that, when evaluated under a proper standard of prejudice, his trial counsel's failure to obtain and use the videotaped interview of Harris entitles him to a new criminal trial. Second, and alternatively, petitioner argues that the court erred in rejecting his myriad other specifications of alleged inadequate assistance.

Defendant counters that counsel's failure to impeach Harris with the videotape does not warrant post-conviction relief for either of two alternative reasons. First, defendant argues that, contrary to the court's determination that petitioner's trial counsel was "plainly ineffective," counsel's failure to obtain and use the videotape was a reasonable tactical decision because use of such evidence would have opened the door to damaging testimony about petitioner. Second, defendant argues that, even if trial counsel's performance was deficient, the trial court correctly concluded that petitioner was not prejudiced by his trial counsel's omission. In addition,

defendant asserts that the trial court properly rejected petitioner's other allegations of ineffective assistance.

■■ Post-conviction relief is available when there has been a "substantial denial" of "rights under the Constitution of the United States, or under the Constitution of the State of Oregon, or both, and which denial rendered the conviction void." ORS 138.530(1)(a). To prevail on post-conviction relief for inadequate assistance of counsel under Article I, section 11, of the Oregon Constitution, "petitioner must show, 'by a preponderance of the evidence, facts demonstrating that trial counsel failed to exercise reasonable professional skill and judgment and that petitioner suffered prejudice as a result.' " *Horn*, 180 Or App at 146 (quoting *Trujillo v. Maass*, 312 Or 431, 435, 822 P2d 703 (1991), and *Bogle v. Armenakis*, 172 Or App 55, 59, 18 P3d 390 (2001)). In order to prove prejudice of a constitutional magnitude, petitioner must show that "counsel's advice, acts, or omissions had '*a tendency to affect the result of the prosecution.*' " *Ashley*, 139 Or App at 392 (quoting *Stevens v. State of Oregon*, 322 Or 101, 110, 902 P2d 1137 (1995) (emphasis in *Stevens*)).

At the outset, we reject, without further discussion, petitioner's challenge to the trial court's disposition of all specifications of inadequate assistance except those pertaining to the failure to impeach Harris. We turn, then, to that remaining matter.

As amplified below, we conclude that counsel's failure to impeach Harris with the videotaped interview does not support an entitlement to post-conviction relief. In particular, assuming without deciding that counsel's failure to review and use the videotape breached the standard of constitutionally adequate representation, when viewed in the totality of the evidence, that default did not have the requisite tendency to affect the outcome of the case.[1]

---

[1] Given the nature of our analysis and disposition, we need not, and do not, address defendant's alternative basis for affirmance, *viz.*, that, contrary to the post-conviction court's subsidiary determination, trial counsel's failure to impeach Harris represented a reasonable tactical decision.

■ We begin with petitioner's argument that the post-conviction court employed a legally erroneous test in evaluating prejudice. In its findings and conclusions, the post-conviction court advanced an extensive critique of appellate authority addressing the "prejudice" component of post-conviction claims and expressed its view that the Oregon Supreme Court's formulation of the "prejudice" inquiry in *Stevens* "does not accurately reflect either the holding of the case it cites as authority, *Krummacher* * * *, or the intervening case of *Trujillo v. Maass*, 312 Or 431, 822 P2d 703 (1991)." In particular:

> "*Krummacher* establishes that failures of trial counsel can *never* reach constitutional magnitude unless these failures at least have a 'tendency' to affect the result. * * * However, *Krummacher* is relied upon by the *Stevens* court for a significantly different proposition: that 'those acts or omissions which would have a tendency to affect the result' are constitutionally prejudicial. * * * The two are not the same thing at all. The *Krummacher* case states a minimum threshold that conduct must meet before it could be considered to be of potential constitutional magnitude. *Stevens* then references that minimum threshold as if it were enough without more, and *Stevens* is frequently cited for that proposition at the trial court level."

(Emphasis in original.)

The post-conviction court then noted that a common definition of "tendency" is "an inclination to move or act in a particular direction or way"[2] and that, under the test apparently endorsed by the Supreme Court in *Stevens*, "[n]early everything that any trial counsel does or fails to do could have a 'tendency' to affect the verdict." The post-conviction court further observed that, applying that definitional approach in this case, petitioner's trial counsel's failure to impeach Harris with the videotaped interview would have a "tendency" to affect the outcome. Nevertheless, after noting that "[m]ore than such an undemanding and easily triggered

---

[2] Although the trial court cited "Webster's" for that definition, *Webster's Third New Int'l Dictionary* (unabridged ed 1993), does not include an identical definition. However, that source does include a substantively similar definition: "[A]n inherent or acquired inclination to move in a given direction * * *." *Id.* at 2354.

measure should be required to establish a constitutional deprivation," the court stated:

> *"Carefully analyzed, Krummacher can be seen to establish a two prong test to determine whether trial counsel was constitutionally adequate. First, the error must have had a tendency to affect the result. **Second, when viewed in the context of the entire proceeding, the error must not be inconsequential.**"*

(Emphasis and boldface added.) Finally, applying that test to petitioner's case, the post-conviction court concluded:

> "Because of some rather loose and problematic language in *Stevens*, the legally correct result in the present case does not appear entirely clear. However, placing the *Stevens* language in the perspective of the *Krummacher* case on which it relies, I find that this petition should be denied. In the context of the entire case and the clear weight of the evidence presented in that proceeding, I find trial counsel's failure to get the tape and use it at trial was quite probably inconsequential. In other words, it is unlikely that it could have affected the result under all the circumstances."

As noted, petitioner asserts that the post-conviction court's formulation of the prejudice inquiry was legally erroneous. In particular, petitioner argues that the post-conviction court was correct in its initial determination that, under a literal understanding of "tendency," counsel's failure to impeach Harris with the videotape had a "tendency" to affect the result of the criminal case. However, petitioner asserts that the court erred in "adding the additional factual and legal finding" that "when viewed in the context of the entire proceeding, the error must not be inconsequential." That is, petitioner asserts that the court interjected a new and unsupported element into the post-conviction prejudice inquiry.

Defendant responds that there is nothing truly new about the post-conviction court's formulation—that is, that any ostensible distinction is a matter of form and not of substance:

> "[A]lthough the post-conviction court added a new analytical step—that counsel's act or omission must not be inconsequential—this requirement is consistent with the

standard used by this court. This court has consistently measured the prejudice prong over the totality of the circumstances, *viz.*, counsel's act or omission is placed in the context of all the evidence adduced at trial to determine what, if any, prejudice occurred."

We agree. *See Horn*, 180 Or App at 147, 151.

In *Horn*, the petitioner appealed from a judgment denying him post-conviction relief from his convictions for sexual abuse, unlawful sexual penetration, and sodomy. 180 Or App at 141. The petitioner argued that the court had applied an incorrect formulation of the prejudice standard in requiring a "reasonable probability" that his trial counsel's error affected the result of the prosecution. The petitioner further argued that, considered under the correct standard, his trial counsel's failure to introduce evidence of the child victim's recantation before trial had prejudiced him. *Id.* at 141, 146.

We concluded that the court's probability analysis required too much and that, consistently with *Stevens*, the proper question is whether the omitted evidence would have had a tendency to affect the outcome of the prosecution. *Horn*, 180 Or App at 148. We further held that, when considered under the correct standard, the petitioner's trial counsel's failure to introduce evidence of the child victim's recantation before trial had a tendency to affect the result of the case. In reaching that conclusion, and in discussing the evolution of the prejudice inquiry, we observed:

> "The Supreme Court first used the phrase 'tendency to affect the result of the prosecution' in *Krummacher*. 290 Or at 883. It concluded that 'only those acts or omissions by counsel which have a tendency to affect the result of the prosecution can be regarded as of constitutional magnitude.' *Id.* Although the court did not elaborate on its conclusion, it held that the petitioner's trial counsel's failure to object to a leading question did not have a tendency to affect the outcome of the prosecution because the omission was 'inconsequential.' *Id.*"

180 Or App at 147. Then, after reviewing subsequent case law, and in summarizing the basis for our holding, we invoked the "inconsequential" language from *Krummacher*:

"We thus conclude that the evidence *was not inconsequential* and that its omission had a tendency to affect the result of that prosecution. Accordingly, the trial court erred in concluding that petitioner was not prejudiced."

*Id.* at 151 (emphasis added).

Thus, in *Horn*, we—like the post-conviction court in this case—considered whether, in the context of the totality of the evidence, defense counsel's default was "inconsequential." However, unlike the post-conviction court here, which treated that determination as distinct from the "tendency" determination, we considered the former to be integral to the latter. That is, in determining whether counsel's default had a tendency to affect the outcome of the case, we considered whether, in total context, that default was "inconsequential."

We adhere to our formulation in *Horn* as comporting with the two-step analysis mandated by *Stevens* and followed in subsequent cases. *See, e.g., Lichau v. Baldwin*, 333 Or 350, 358-59, 39 P3d 851 (2002); *Ashley*, 139 Or App at 392, 397. We concomitantly disapprove of the trial court's formulation, which—in form—prescribes a two-and-one-half- or three-step inquiry. Nevertheless, the post-conviction court's inquiry was *substantively* correct. Accordingly, we proceed to the factual merits of petitioner's contention that counsel's failure to use the Harris videotape had a tendency to affect the outcome of the criminal case. Our determination of that question, in turn, requires an extensive consideration of the evidence presented at petitioner's criminal trial.

As noted, petitioner was convicted of murder for the shooting death of David Nolen on the evening of July 13, 1994. Many of the circumstances of the shooting were undisputed. Most significantly, petitioner did not dispute that he shot Nolen. Rather, the dispute at trial reduced to whether the shooting was intentional or, as the defense contended, accidental. For clarity, we first briefly summarize the undisputed facts and then address in detail the parties' evidence on the critical disputed issue of whether the shooting was intentional or accidental.

Petitioner and Harris were long-time domestic partners. Early in the evening on July 13, 1994, petitioner,

Harris, and their 13-year-old daughter, Rain, drove from their home in Bandon to Port Orford. While in Port Orford, the three encountered a friend, Shawneen Mathews, and were invited to come to her house to drink beer.

A number of people had already gathered at Mathews's home by the time petitioner and his family arrived. Those present included Mathews, her two children (21-year-old Anthony Evans and four-year-old Tiffany), and three visitors—15-year-old Jimmy Bennett, nine-year-old Danny Franklin, and James Borden, an adult acquaintance of Mathews and petitioner. The victim, Nolen, arrived at the party soon after petitioner.

Harris danced in the living room with the children, while petitioner, Mathews, Nolen, and Borden talked in the dining room. Petitioner and Harris had each consumed about three glasses of gin and orange juice that afternoon before leaving for Port Orford, and continued to drink alcohol, along with the other adults at Mathews's home, during the course of the evening.

Petitioner told Nolen about a threat that another individual, John Rutherford, had reportedly made to physically harm his daughter, Rain, a few days before, and asked Nolen where he could find Rutherford. Nolen replied that he did not believe that Rutherford had threatened Rain, and then called Rain a "lying little whore." At some point during the conversation, petitioner took out his handgun, a Mauser 1914 Pocket Pistol, which was tucked in his pants, and showed it to Nolen and Borden. Petitioner handed the gun to Nolen, who then looked it over and commented that it was "a piece of shit gun." Borden and Nolen both laughed at the gun. Nolen returned the gun, and then petitioner shot Nolen in the head, killing him.

Immediately after the shooting, petitioner and his family left Mathews's house and drove to their home in Bandon. On the way home, petitioner repeatedly stated that the shooting had been an accident and that the safety was supposed to be on. Petitioner also stated that he had just been trying to scare Nolen because, after he had told Nolen about Rutherford's alleged threat against Rain, Nolen had called Rain a "lying little whore." After they arrived at their

home, petitioner loaded clothes, a rifle, and ammunition into his car and then left. Petitioner hid out for three days before turning himself in to the police. Petitioner's pistol, which was used in the shooting, was never recovered.

The foregoing facts were undisputed at trial. In support of its allegation that the shooting was intentional, the state presented testimony from Mathews, Bennett, Harris, Rain, Evans, and Borden, as well as from a pathologist and a firearms expert from the Federal Bureau of Alcohol, Tobacco and Firearms (ATF).

Mathews testified that she saw petitioner hand the gun to Nolen. She did not see Nolen take the safety off, do anything with the clip, or pull the slide mechanism back on the gun. According to Mathews, Nolen held the gun for less than 30 seconds before returning it to petitioner. Mathews also testified that, after Nolen stated that the gun was a "piece of shit," Borden had laughed and said "something like that [it] wouldn't hurt anybody." She then heard petitioner say something that caused Nolen to ask whether he should leave. At that point, Mathews saw petitioner do "something" to the left side of the gun, and then he "just lifted up his arm and shot [Nolen]."

Bennett, a 15-year-old visiting Mathews's home, testified that he saw petitioner show the gun to Nolen and that he then heard what he described as "an argument" between Nolen and petitioner. Bennett explained that he believed they were arguing because their voices were raised and that "their voices kind of changed because they got angry." He also specifically stated that petitioner was acting "angry." Bennett heard Nolen tell petitioner that his gun was a "piece of shit" and heard petitioner reply, "Are you trying to tell me this is a piece of shit gun, mother fucker?" He then saw petitioner shoot Nolen. Bennett ran outside after the shot was fired and overheard petitioner say something like, "I just killed him, I gotta go."

Harris testified that, while she was dancing in the living room, she heard the tone of petitioner's voice change— that he sounded "aggravated." She then began to walk toward the dining room to try to "calm him down." As she walked in, she saw petitioner "take the gun off safety * * *

put the gun up between [Nolen's] eyes and he pulled the trigger."

Most of the other individuals present at Mathews's house that evening, although not eyewitnesses to the shooting, also testified as to what they saw and heard. Rain testified that, at some point in the evening, petitioner called her over to tell Nolen about Rutherford's threat. According to Rain, Nolen stated that he found the story hard to believe and then called her "a name." She noted that petitioner did not appear to be angry at that time.

Rain further testified that she then returned to the living room. Five or ten minutes later, she heard petitioner yell, "Do you want to call this a piece of shit gun, mother fucker?" According to Rain, petitioner sounded "angry" when he made that statement. Rain then saw petitioner holding the gun up in the air, and she turned away because she "thought there was going to be a fight or something." She heard a gunshot and ran outside the house.

Evans, Mathews's 21-year-old son, testified that he had gone to bed about 11:00 p.m. that evening but had left his room at least twice after that to turn down the music. After the last time he turned down the music and returned to his bedroom, he overheard petitioner and Nolen discussing the gun. Specifically, Evans testified that it appeared that petitioner had pulled out his gun and was "showing it around." He heard Nolen call the gun a "piece of shit," and soon after that he heard a gunshot. Evans left the bedroom and saw petitioner walking out the front door with a gun in his hand. According to Evans, after petitioner walked outside, Evans heard him tell Harris and Rain to hurry up because he "just shot that fucker in the head."

Neither four-year-old Tiffany nor nine-year-old Danny Franklin testified. Borden, the last witness at the home that night, stated that he had been highly intoxicated that evening and therefore remembered little about the circumstances leading up to the shooting. He testified that he remembered Nolen calling the gun a "piece of shit" and that both he and Nolen laughed at the gun. He did not see petitioner shoot Nolen.

The state also presented the testimony of Dr. Henderson McIntyre, a pathologist, who performed the autopsy on Nolen. McIntyre testified that Nolen died from a gunshot wound just above the right eye, and that it was "pretty much a straight-through shot." The autopsy report detailed that the path of the bullet was "through and through," and "front to back, slightly down to up, and slightly left to right."

The state also called Jimmy Packard, an ATF agent. Because petitioner's pistol was never recovered, Packard brought a gun of the same model in order to demonstrate its features for the jury. Packard first explained that the Mauser 1914 Pocket Pistol is semi-automatic and, therefore, automatically feeds itself through a magazine. Packard then explained that there is a safety lever on the left side of the gun that, when pulled down, prevents the gun from firing. The safety is released by pushing a button located next to the lever. Specifically, he noted that the safety

"is a lever on the left side. When the weapon is loaded you pull it down. You can tell when it is loaded. * * * To make it safe, you push this lever down and the weapon will not fire if you accidentally pull on the trigger. To make it fire you just push the button. The lever goes back up and then it is ready to fire."

Packard further testified that there are two ways to load the gun. The first option is to pull the slide back and then insert the magazine. When the magazine is completely pushed in, the slide automatically goes forward and chambers a round in the barrel. The second method of chambering a round is to insert a full magazine into the gun and then pull back and release the slide. Thus, although the two methods of loading the gun are different, they both require the gun operator to pull back the slide in order to chamber a round. Packard testified that he had tested two different guns of that model, and that it was "not really" easy to pull back on the slide—that it "takes a little bit to pull it back."

Petitioner testified in his own defense. He first stated that after he handed his gun to Nolen, Nolen had wiped the gun on his leg and had played with the gun, "spinn[ing] it." Petitioner agreed with the other witnesses

that Nolen had called the gun a "piece of shit," but he added that all three of them—he, Nolen, and Borden—were laughing about the gun, not just Borden and Nolen. He further noted that the three had to yell at each other to be heard over the loud music that was playing in the house.

Petitioner denied both that he had said to Nolen, "I'll show you a piece of shit gun, mother fucker," to Nolen, and that Nolen, in response, had asked petitioner whether he should leave. Instead, petitioner testified that, when he told Nolen about Rutherford's threat against Rain, Nolen replied that he did not believe that Rutherford would do that, and that Nolen then called Rain a "lying little whore." Petitioner testified:

> "I said, 'Aw David, you don't mean that. Don't think like that. * * * Maybe you didn't hear what she said. * * * What about if I call her back in here and let her tell you again?' * * * And he said, 'Nah, I don't think so.' "

At that point, according to petitioner, Nolen handed the gun back and told petitioner he was planning to leave. Petitioner testified that he was sitting in a chair at the time and that he rested the gun on his leg. As petitioner and his family were also about to leave, both he and Nolen

> "raised up out of the chair, and when we raised up out of the chair I had the gun trigger guard on this finger. I just—I stuck that finger in it and was going to do like he did. He had been spinning it, you know. *And when we—about the time we was at full, you know, standing up, I spun it like that, and when I caught the grip, when I caught it to stop it from spinning—I was going to do like the cowboys, you know, spin it and post it like that, and that's what I tried to do. And when I grabbed it, it went off.*"

(Emphasis added.)

During cross-examination, petitioner testified that, when he handed the gun to Nolen the safety was on and there was no round in the chamber. He said that he was sure of that because "that is the way I carry my guns." Petitioner denied disengaging the safety or chambering a round. He acknowledged that he did not see Nolen either take the safety off or put a bullet in the chamber and that he did not know how either of those things could have happened. When asked

whether he had, in fact, told Harris and his daughter in the car after the shooting that the shooting had occurred because he thought the safety was on the gun, petitioner stated that the safety "was supposed to be on."

With the backdrop of that totality of the evidence, we return to petitioner's argument that his counsel's failure to make use of the Harris videotape had a tendency to affect his conviction for murder. In that regard, petitioner advances two arguments. First, petitioner contends that Harris's statements in the videotape would have corroborated his account that the shooting was accidental. Second, petitioner asserts that Harris's statements in the videotape that the shooting was "accidental" flatly contradicted her trial testimony and would have directly impeached that testimony.

Petitioner's first argument is based on a fundamental misunderstanding of the videotape's proper uses. Because Harris's videotaped statement is hearsay, it was admissible only for the limited purpose of impeaching her testimony and not as substantive evidence. *See State v. Arnold*, 133 Or App 647, 650, 893 P2d 1050 (1995) (holding that, because the victim's statements were not made under oath or at an earlier proceeding, they were not admissible as substantive evidence under OEC 801(4)(a)(A)). Consequently, contrary to petitioner's argument, the videotaped statement could not properly have been considered by the jury to "bolster" the credibility of his testimony that the shooting was accidental.

With respect to impeachment, petitioner asserts that Harris's credibility was critical to the state's case. That was so, petitioner suggests, both because of her long-standing intimate relationship with petitioner and because she was the only witness who explicitly testified that she saw petitioner release the safety before shooting Nolen. Thus, in petitioner's view, Harris was the state's single most powerful witness that the killing was intentional, and impeaching her testimony necessarily would have had a tendency to affect the jury's verdict.

Defendant responds—and the post-conviction court agreed—that petitioner failed to establish the requisite "tendency" for either or both of two reasons: (1) Harris was otherwise impeached at trial, so impeachment through the videotape would have been merely cumulative—bluntly, the jury

was either going to believe Harris or it wasn't, and further impeachment would not have made any difference. (2) Even excluding Harris's trial testimony, the evidence of petitioner's guilt, and particularly that the shooting was intentional, was so overwhelming that, even if the jury completely disbelieved and disregarded Harris's testimony, no reasonable trier of fact could have failed to convict petitioner of murder. We reject defendant's first response as unpersuasive but accept the second response as independently sufficient to warrant the denial of post-conviction relief.

■     In contending that any impeachment through the videotape would have been cumulative, defendant asserts:

> "[B]ecause Harris had already admitted that she lied to the police about petitioner's involvement on more than one occasion, any damage to her credibility that the videotape may have provided would have been merely cumulative."

The problem with that argument is that it cannot be squared with what actually occurred at trial. We emphasize at the outset—as defendant neglects to acknowledge—that Harris was *never* impeached with prior inconsistent statements by *defense counsel*. Rather, the only manner in which the jury was informed of any inconsistency in Harris's statements was upon direct examination by the *prosecutor*.

Even more fundamentally, none of the prosecutor's questions confronted Harris with any prior statement by her that the shooting was "accidental." Instead, the only "inconsistent" statements the prosecutor mentioned were Harris's statement to police on the night of the shooting that petitioner had "gotten out at the county line" as they drove home after the shooting (which she later admitted was false) and Harris's initial statement to the police that she "hadn't seen what happened" on the night of the shooting.[3] At no time was Harris impeached with the substance of her videotaped remark that the shooting was "accidental." Harris was never asked to explain or justify that description, which was utterly irreconcilable with her graphic trial testimony describing petitioner's deliberate actions in releasing the safety, pointing the Mauser between Nolen's eyes, and then firing. In

---

[3] At trial, Harris said that she made both statements because she was "scared."

sum, any "impeachment" that occurred at trial was qualitatively different from that which would have occurred had Harris been confronted with her videotaped statements. Defendant's "cumulative impeachment" response is unavailing.

■ We conclude, however, that defendant's alternative, "overwhelming evidence of guilt," response is decisive. Contrary to petitioner's contention, Harris's credibility was not central, or even particularly significant, to the prosecution. Rather, based on our review of the record, even if the jury had disbelieved and discarded Harris's trial testimony as not credible, there was such other overwhelming evidence of petitioner's guilt as to render defense counsel's failure to impeach Harris "inconsequential." *See Horn*, 180 Or App at 147, 151. Of particular significance are, in combination, the undisputed findings of the pathologist, McIntyre, the testimony of the firearms expert, Packard, and the consistent and disinterested testimony of the other eyewitnesses, Mathews and Bennett, as well as the corroborating testimony of petitioner's daughter, Rain.[4]

McIntyre testified that the fatal shot was "pretty much a straight-through shot" just above Nolen's right eye. That undisputed forensic evidence comports with the state's evidence, including the testimony of Mathews and, by implication, of petitioner's daughter, that petitioner raised the gun to Nolen's head and shot him. Conversely, petitioner adduced no evidence, either through cross-examination of McIntyre or through other expert testimony, that such a "straight-on" shot through the head could be reconciled with petitioner's accidental, "cowboy-style" spinning account of the shooting.

Packard's testimony further established the patent incredibility of petitioner's assertion that the shooting was accidental. That testimony established that, for the shooting to occur, not only would the trigger have to have been depressed and the safety released, but a round would have to have been chambered by pulling back the slide mechanism on the Mauser, which was not "really easy."

---

[4] Thus, unlike *Lichau*, which petitioner invokes, this was not a "swearing-match" case in which the success of the prosecution ultimately depended on the credibility of a single complainant or witness.

Packard's testimony was particularly damning when considered in combination with petitioner's own testimony. Petitioner testified that when he handed the gun to Nolen, the safety was on and no round was chambered. The defense offered no plausible explanation for how, in those circumstances, merely "spinning" the gun could discharge the weapon. In fact, petitioner admitted that he did not see Nolen, or anyone else, release the safety or pull back the slide mechanism to chamber a round.[5]

Mathews and Bennett, the two eyewitnesses other than Harris, offered testimony corroborating that the shooting occurred in a manner absolutely consistent with the pathologist's findings and the firearms evidence. Mathews testified about the interaction between petitioner and Nolen that preceded the shooting and, particularly, that immediately before the shooting, she saw petitioner do "something" to the left side of the gun (where the safety was located), lift up his arm, and shoot Nolen. Bennett also testified about petitioner's and Nolen's angry interactions—and particularly that, just before petitioner shot Nolen, Bennett heard Nolen tell petitioner his gun was a "piece of shit" and heard petitioner reply, "Are you trying to tell me this is a piece of shit gun, mother fucker?" Bennett then saw petitioner shoot Nolen.

The record discloses no bias on Mathews's or Bennett's part; they had no apparent reason to fabricate their accounts. Conversely, neither they—nor anyone except petitioner—testified that petitioner had been spinning or twirling the Mauser when it discharged.

Finally, the testimony of a witness who *was* arguably interested, petitioner's daughter, Rain, cross-corroborated the scientific and eyewitness testimony. Rain testified that, although petitioner did not appear to get angry when Nolen called her an insulting name, he did sound angry five or ten minutes later when she heard him yell, "Do you want to call this a piece of shit gun, mother fucker?" At that point, consistently with Mathews's testimony, Rain saw petitioner

---

[5] Even if, as petitioner testified, Nolen had rubbed the gun on his leg, and even if, as petitioner apparently meant to imply, that could have disengaged the safety, petitioner advanced no explanation for how a round was chambered.

holding the gun in the air. She turned away because she "thought there was going to be a fight or something" and then heard the gunshot.

In sum, even discarding Harris's trial testimony, the state offered overwhelming, cross-corroborating physical evidence and eyewitness testimony that the shooting was intentional. In response, petitioner offered an account that was irreconcilable with the physical evidence, contrary to the testimony of disinterested witnesses, and uncorroborated by any other witnesses. Viewed in the totality of the evidence and circumstances at trial, criminal defense counsel's failure to impeach Harris did not have a tendency to affect the jury's verdict.

The post-conviction court correctly denied post-conviction relief.

Affirmed.