On appellant's petition for reconsideration filed January 18, and respondent's response filed February 17, 2015, reconsideration allowed; former disposition (267 Or App 802, 342 P3d 1126 (2014)) withdrawn; reversed and remanded with instructions for post-conviction court to grant petitioner relief on Counts 1, 2, and 5; otherwise affirmed April 6, 2016

## TREVOR TROY WALRAVEN,
*Petitioner-Appellant,*

*v.*

## Jeff PREMO,
Superintendent,
Oregon State Penitentiary,
*Defendant-Respondent.*

Marion County Circuit Court
08C18038; A150453

372 P3d 1

Andy Simrin and Andy Simrin PC for appellant's petition.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Ryan Kahn, Assistant Attorney-in-Charge, for respondent's response to appellant's petition.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

ORTEGA, P. J.

**ORTEGA, P. J.**

As allowed by ORAP 6.25(1)(d),[1] petitioner asks us to reconsider our December 24, 2014, decision, in which we affirmed without opinion the post-conviction court's judgment denying relief. His request is made in light of *Wade v. Brockamp*, 268 Or App 373, 390, 342 P3d 142 (2015), in which we concluded that trial counsel's failure to challenge the "natural and probable consequences" instruction given to the jury at the petitioner's trial amounted to constitutionally inadequate assistance of counsel. In petitioner's case here, the post-conviction court denied relief on that same issue, among other claims, and petitioner now argues that *Wade* requires us to reverse the court's denial. Defendant contests petitioner's claim that his attorney's failure to object to the instruction was constitutionally inadequate and asserts, in any event, that, because petitioner admitted to killing the victim during a "second look hearing," which occurred after his post-conviction trial, his claim here is moot or he is judicially estopped from seeking relief. We reject defendant's assertions regarding petitioner's post-trial admission and, for the reasons stated below, conclude that the post-conviction court erred in its determination that petitioner's trial counsel was not constitutionally inadequate in failing to object to the "natural and probable consequences" jury instruction as to his aggravated murder and murder convictions. We also conclude, however, that the post-conviction court did not err as to petitioner's felony murder conviction because the erroneous instruction did not prejudice him as to that conviction. Accordingly, we grant reconsideration, withdraw our former disposition in part, and remand the post-conviction court's judgment.

## I. BACKGROUND

### A. *Procedural Background*

Petitioner was 14 years old when the 1998 armed robbery and killing of a single victim took place. Petitioner was charged with three counts of aggravated murder, ORS

---

[1] ORAP 6.25(1)(d) provides for reconsideration based on "[a] claim that there has been a change in the statutes or case law since the decision of the Court of Appeals."

163.095 (murder in an effort to conceal the crime of first-degree robbery (Count 1), murder in an effort to conceal the identity of a perpetrator of the crime of first-degree robbery (Count 2), and personally and intentionally causing the death of the victim while in the course of committing first-degree robbery, *i.e.*, aggravated felony murder (Count 3)), and two counts of murder, ORS 163.115 (felony murder (Count 4) and intentional murder (Count 5)). Petitioner was tried as an adult in July 2000. The jury found petitioner guilty of Counts 1, 2, 4, and 5, but did not reach a verdict on Count 3. The court merged the guilty verdicts on Counts 1 and 5 and, on appeal, we remanded the case so that the trial court would merge the guilty verdicts for aggravated murder, Counts 1 and 2, into one aggravated murder conviction. *State v. Walraven*, 187 Or App 728, 69 P3d 835, *rev den*, 335 Or 656 (2003). Petitioner appealed his convictions again, and we remanded to the trial court to merge the guilty verdicts for felony murder (Count 4) with the remaining verdict of aggravated murder. *State v. Walraven*, 214 Or App 645, 167 P3d 1003 (2007), *rev den*, 344 Or 280 (2008). Thus, petitioner remains convicted of one count of aggravated murder, for which he was sentenced to a minimum of 30 years' imprisonment.

A person who was tried as an adult for crimes committed as a juvenile and who has served one-half of his term of imprisonment is entitled, under ORS 420A.203, to a "second-look hearing" to determine whether he "has been rehabilitated and reformed, and [whether,] if conditionally released, the person would not be a threat to the safety of the victim, the victim's family or the community and * * * would comply with the release conditions." ORS 420A.203(3)(k). If found to meet various criteria, the person is conditionally released, and the Department of Corrections must prepare a release plan. One of those criteria is "[w]hether the person demonstrates accountability and responsibility for past and future conduct[.]" ORS 420A.203(4)(b)(H).

In September 2014, having served half of his 30-year sentence, petitioner obtained such a "second-look hearing" and, in that hearing, testified under oath that he personally and intentionally shot and killed the victim. He explained that he stopped the victim at gunpoint, ordered him to drive

to a remote location, and shot him in the head. Finding petitioner to be an exemplary prisoner, the trial court ordered his conditional release and the preparation of a release plan. The state has appealed the court's order, arguing that a person convicted of aggravated murder is not entitled to a second-look hearing. That order is the subject of a separate appeal that is pending in *State v. Walraven* (A158001).[2]

B. *Petitioner's Criminal Trial*

The bulk of the state's evidence (summarized to the jury in a 29-point chart used during the state's closing arguments) consisted of circumstantial evidence that tied both petitioner and his older brother to the armed robbery and fatal shooting. Witnesses saw petitioner and his brother in possession of the victim's green Suburban, including driving it and trying to sell it. The state highlighted inconsistencies in petitioner's statements to investigators, in which he asserted that he had stumbled upon the Suburban after the victim had been killed and was only guilty of theft. Petitioner also attempted to buy gas and withdraw money from an ATM using the victim's cards. The body had been moved, and the state posited that it was too heavy for petitioner—who weighed 140 pounds—to move it alone. Witnesses observed the brothers in the area where the killing occurred. Ballistics testing of the bullets recovered from the victim was consistent with a gun similar to one owned by petitioner's brother. In sum, the prosecutor argued that the evidence "can only be explained by the fact that [petitioner] and [his brother] are involved in this, that they took [the victim] by gunpoint, they took his vehicle. They killed him."

As to evidence that petitioner personally killed the victim, when police arrested petitioner and his brother, petitioner told them that his brother was not involved in the crimes. The state also drew attention to the witness

---

[2] In addition to the state's appeal of the conditional release, the Department of Corrections asserted that it was not required to prepare the ordered release plan because its obligation to do so was automatically stayed under ORS 138.160. Petitioner then filed a petition for a writ of mandamus in the Oregon Supreme Court. Ultimately, in *State ex rel Walraven v. Dept. of Corrections*, 358 Or 71, 362 P3d 1163 (2015), the court disagreed and ordered the department to prepare a proposed release plan and submit it to the trial court. The department complied, and petitioner was conditionally released on February 4, 2016.

testimony of Haynes, to whom petitioner and petitioner's brother had tried to sell the Suburban. Haynes testified that he heard petitioner suggest that he, petitioner's brother, and Haynes could order a pizza and not pay for it because they "could do whatever [to the delivery person] and get the money." Following that suggestion, petitioner was reported by Haynes to have said, "That's nothing compared to what I did to get this truck." And, according to Haynes, petitioner said that he had taken an old man into the woods and shot him in the head three times. Also, Haynes recounted that petitioner had told him that "chunks or pieces went everywhere" when the bullet struck the victim's head.

To provide context for the state's theory of criminal liability, we pause to briefly summarize—discussed in more detail below and in *Wade*, 268 Or App at 378—the erroneous "natural and probable consequences" instruction. Under Oregon law, for a person to be criminally liable as an accomplice, the person must be found to have *intended* that the crime of which he or she is accused to have occurred. *See* ORS 161.155(2)(b) ("A person is criminally liable for the conduct of another person constituting a crime if * * * [w]ith the intent to promote or facilitate the commission of the crime the person * * * [a]ids or abets or agrees or attempts to aid or abet such other person in planning or committing the crime[.]"). The instruction at issue here—discredited in *State v. Lopez-Minjarez*, 350 Or 576, 260 P3d 439 (2011)— which allows a factfinder to find a defendant guilty for a crime that is "the natural and probable consequence" of an underlying crime, relieves the factfinder of finding that the defendant *intended* the consequential crime, as required by ORS 161.155. Thus, in this case, the crux of petitioner's argument is that the state's prosecution of its case and the instruction directed the jury to find petitioner guilty of the murder charges, without finding that he intended to kill or help kill the victim, so long as it found that petitioner was involved in the armed robbery.

To return to the criminal trial, in closing arguments, the prosecutor began presenting its theory, asserting:

> "First I want to talk about the legal concepts that are involved in this case, the concepts of aiding and abetting,

the concept of felony murder, and then talk to you about the specific charges, the five counts of Aggravated Murder and Murder that [petitioner] is charged with. * * * I have some charts that I want to put on the screen for you and *show you how beyond any reasonable doubt [petitioner's brother] and [petitioner] were both involved in this robbery and murder of [the victim]."*

(Emphasis added.) After having explained the theories of principal and felony murder liability, the prosecutor explained the state's theory of accomplice liability:

"[Petitioner] is charged with a number of counts, Aggravated Murder and Murder, and all but one of these counts, *all but one of these counts is based on aiding and abetting.* In other words, it doesn't matter who pulls the trigger, who killed [the victim]. If you're satisfied that [petitioner] and [petitioner's brother] were both there and both involved in this *and both intended that this armed robbery take place, then it doesn't matter if anyone intended for [the victim] to die or not. It's enough that he's there, he's aiding and abetting at the very least, if you find that [petitioner's brother] is in the activity.*

"If [petitioner's brother] were the one, and I'm speaking hypothetically—I'm not going to argue this when we get to the facts—but I'm just saying that even if you made that finding, that [petitioner's brother] is the main actor here, that [petitioner] *simply participated in the armed robbery, stood by during the actual act of homicide, help carry the body off the road and hide it, then enjoyed the fruits of the crime by riding around in the Suburban and spending the money, then he's guilty of all these charges, as I'll show you, except for one."*

(Emphases added.) The prosecutor continued:

"So these three counts are based on intentional homicide. Count V, Murder, and Counts I and II, Aggravated Murder. And they're based equally on the idea of aiding and abetting, where you don't actually have to decide who pulled the trigger, you don't have to reach that point.

"* * * * *

"There is—in these elements you can see *there's nothing about an intent to kill. The only intent is the intent to commit robbery in the first degree."*

(Emphasis added.) The prosecutor then differentiated those charges from the aggravated felony murder charge, which required that petitioner "personally and intentionally" caused the victim's death:

"The final count is Count III, and that is commonly referred to as Aggravated Felony Murder as opposed to Aggravated Murder because of an aggravating circumstance to murder, and it's felony murder. You'll see that the elements of Aggravated Felony Murder are exactly the same as Felony Murder except for three words, and those words are these, 'personally and intentionally.' For Aggravated Felony Murder you must make the finding that the defendant himself caused the victim's death.

"I'm going back to felony murder again. You can see that those words aren't there. So what you might refer to as ordinary felony murder is enough if the defendant participated, aided and abetted a robbery in the first degree, knowing that a gun is being used and the gun ends up killing somebody. But to make it aggravated murder, there's the additional requirement that the defendant be the one personally and *intentionally* who killed [the victim].

"Now, by putting it to you this way, I'm not suggesting that [petitioner] is not the one who pulled the trigger. I'm just separating this for analysis because legally speaking, in your legal analysis, you're applying the facts to the law as the judge will tell you. The aiding and abetting is enough to *** find him guilty of four of the counts. You only have to decide if he was the actual shooter for the one count, Count III.

"Let's look now at the evidence that shows participation of both of these individuals. ***"

(Emphasis added.)

About Haynes's testimony, the prosecutor stated:

"Haynes's account proves to you beyond a reasonable doubt that [petitioner] personally and intentionally murdered [the victim] in the course of and in furtherance of taking the Suburban by force. This is the strongest evidence you have of [petitioner's] guilt of Count [3], Aggravated Felony Murder.

"Without this statement, you have a lot of other information that puts [petitioner and petitioner's brother] together in committing the crimes. But when you add in his statement to *** Haynes, you now know who is the murderer and you know it's beyond a reasonable doubt."

The prosecutor concluded his argument by expressing the state's position that petitioner was the shooter:

"There just is no reasonable doubt that [petitioner] was involved in this. He and his brother falsely claimed that their revolvers were stolen approximately two weeks earlier. They intended to obtain the vehicle. They intended to do it on this day and to use force if necessary. They intended to display a revolver to [the victim] or whoever their chosen victim was to compel him to do what they demanded him to do, and they fully intended to take that vehicle. That was robbery in the first degree.

"Independently of the robbery, [petitioner] took one more step. He toyed with [the victim], saying he would not kill him when asked three times if he was going to. He made [the victim] get out of the vehicle to keep blood from getting in the truck that he intended to steal. Whether [petitioner] made [the victim] kneel, or whether [the victim] knelt down himself for a final prayer, we will never know. But it was in that position that [petitioner] shot [the victim] in the head. That is Intentional Murder. That's Count V."

In petitioner's closing argument, his trial counsel characterized Haynes's testimony as inconsistent and unreliable. In response, the prosecutor asserted that,

"if you take off the things I said about *** Haynes, you still have 27 points on that chart, and *** the defense really still has a lot of accounting to do. ***

"*** Haynes is really just the extra bit, the extra bonus that gives you that certainty you need. *But even without it, could you find this beyond a reasonable doubt? You probably could, except for Count III.*"

(Emphasis added.)

Consistently with the state's theory of the case, the trial court instructed the jury as to accomplice liability:

"A person who is involved in committing a crime may be charged and convicted of that crime if with the intent

to promote or facilitate commission of the crime, that person aids and abets someone on committing the crime. Under these circumstances, it is not necessary for that person to be personally present at the time and place of the commission of the crime."

The court also gave the following instruction, known as the "natural and probable consequences" instruction, which, at the time, was Uniform Criminal Jury Instruction 1052:

"A person who aids and abets another person in committing a crime, in addition to being criminally responsible for the crime that is committed, is also criminally responsible for any acts or other crimes that were committed as a natural and probable consequence of the planning, preparation or commission of the intended crime."

Petitioner's attorney did not object or take exception to the instruction. The jury unanimously found petitioner guilty of Counts 1, 2, 4, and 5, but three jurors did not find petitioner guilty of Count 3, aggravated felony murder, and, consequently, the jury did not reach a verdict on that charge.

C. *Post-Conviction Relief Trial*

Petitioner's post-conviction trial was held in 2012 in Josephine County. At the trial, Portland attorney Marc Sussman testified that, at the time of petitioner's trial in 2000,

"the standard practice in preparing, you know, any jury trial case, but particularly a serious case like an aggravated murder case, would be to evaluate any of the potential legal issues in the case and when the jury instructions are involved that go to a key issue in the case, to thoroughly research the law on those particular points. Where the instructions raise a point in the case, you know, an issue that was central to either the defense in the case or the prosecution in the case, to examine that as to whether a special instruction was proper or whether or not there were any issues to be raised with the uniform instructions that were offered at the time, particularly if there was any recent case law that might have raised questions about that. And again, when I talk about that being I think the standard of practice, one of the things that has been impressed on counsel in capital cases certainly, but also I mean in major cases, had been to diligently research any legal issues in

the case to be able to raise potential error and preserve error that may result in reversible error in a case and jury instructions is where that's a particularly significant area for that approach."

Sussman opined that our decision in *State v. Anlauf*, 164 Or App 672, 995 P2d 547 (2000), decided before petitioner's trial, "raised some questions about the accomplice liability application that I think reasonable counsel, you know, at that time would have and should have been highlighting that case and bringing that to the Court's attention in the framing of the jury instructions." He added that, for aggravated murder cases, standard practice would be to raise a challenge if there was "case law that would raise questions about how the accomplice instructions were being applied in a case or the question of viability of an instruction."

Petitioner's criminal trial counsel stated in an affidavit, as to petitioner's claim that the failure to object to the instruction was unreasonable, that he believed that he

"should not be found ineffective for being unable to accurately predict the evolution of case law years in the future. As a legal matter, my understanding is that my effectiveness is judged by the law existing at the time of my representation, as it should be in all fairness. At the time I represented [petitioner], I had no reason to believe that an objection to the jury instruction would have been successful, or that resulting changes to the jury instructions would have changed the jury verdicts. I make this assessment based on my experience as a trial lawyer, evaluation of the case law existing at the time of [petitioner's] trial, and personal observations of the jurors during trial and the reading of the verdicts."

The post-conviction court noted in its findings that *Anlauf* was decided six months before petitioner's trial and that *Anlauf* concerned sufficiency of the evidence, not the jury instruction. The court stated that petitioner's trial counsel's performance "is judged by the law that was in effect at the time of his representation. The 'Natural and Probable Consequences' instruction was not specifically disapproved until [*Lopez-Minjarez*]." The post-conviction court also made a credibility finding with respect to petitioner's attorney witnesses regarding their testimony about the multiple claims alleged to the court:

"Although the attorney experts are skilled attorneys, they admitted a lack of familiarity with the practices of Josephine and Jackson Counties and they have not practiced in front of either Judge O'Neal or Judge Neufeld. Trial counsel, on the other hand, regularly practiced in those courts and had been a licensed attorney for 25 years at the time of his representation of Petitioner. Neither of the attorney experts read a sufficient amount of the expert opinions or the transcripts to offer opinions upon which this court can rely. Trial counsel's affidavit is credible and persuasive."

Additionally, the post-conviction court made findings about whether the failure of petitioner's counsel to object to the instruction prejudiced petitioner:

"[I]n both *Lopez-Minjarez* and *Anlauf*, the facts against the accused were significantly more tenuous than the evidence against Petitioner. \* \* \* Also, in *Lopez-Minjarez*, the prosecutor misstated the law regarding co-defendant's liability and the instruction was pivotal to the prosecution's theory and thereby exacerbated the error. Such was not the case in Petitioner's trial. In Petitioner's trial, the prosecution's theory was that Petitioner was the shooter, *there was only brief mention of the natural and probable consequences instruction and the prosecutor never suggested that Petitioner could be found guilty without a requisite finding that he was intentionally involved in all aspects of the crime.*

"The fact that three of the jurors were not convinced beyond a reasonable doubt that Petitioner personally shot the victim while in the course of the commission of the felony of Robbery in the First Degree does not convince this court that the giving of the instruction (which was disapproved ten years after the Petitioner's trial) had a tendency to affect the outcome of the trial."

(Emphasis added.) The court denied post-conviction relief to petitioner as to the failure to object or take exception to the "natural and probable consequences" instruction, as well as petitioner's other claims.

## II.  DISCUSSION

### A.  *Petitioner's Post-Trial Admission*

Before proceeding to the merits of petitioner's inadequacy of counsel claim, we briefly address defendant's

arguments concerning petitioner's sworn testimony during his 2014 second-look hearing that he personally killed the victim. Defendant argues for the application of the doctrine of judicial estoppel, which "preclude[s] a party from assuming a position in a judicial proceeding that is inconsistent with the position that the same party has successfully asserted in a different judicial proceeding." *Hampton Tree Farms, Inc. v. Jewett*, 320 Or 599, 609, 892 P2d 683 (1995). Defendant contends that petitioner successfully assumed a position—that he personally and intentionally killed the victim—and that that position conflicts with his claim that his attorney assisted him inadequately. In particular, according to defendant, because his second-look hearing testimony demonstrates that he alone committed the killing, petitioner should be denied post-conviction relief that ultimately rests on petitioner's argument that the jury potentially convicted him on an incorrect accomplice liability theory. Assuming for the sake of argument that judicial estoppel is appropriate in criminal and post-conviction relief cases—Oregon appellate courts have yet to apply the doctrine in such cases—petitioner is not estopped from asserting that his attorney was constitutionally inadequate. That is, judicial estoppel does not apply here for a variety of reasons, including that an admission of guilt is not in this case a position inconsistent with the position that trial counsel was inadequate: A criminal defendant has a constitutional right to adequate assistance of counsel regardless of whether he or she committed the acts constituting the crime or admitted to doing so.

In response to our request for supplemental briefing asking the parties what practical effect the "second-look hearing" admission would have on the relief sought by petitioner—a new trial—defendant also asserts that, because petitioner testified—"in the same underlying criminal proceeding—that he personally committed the murder, the result of any new trial would be the same." Thus, according to defendant, the sworn admission renders petitioner's case moot because a retrial could have no practical effect. *See Brumnett v. PSRB*, 315 Or 402, 405-06, 848 P2d 1194 (1993) (a requirement "for a justiciable controversy is that the court's decision in the matter will have some practical effect

on the rights of the parties to the controversy"). Petitioner responds that, in a criminal case, defendants are afforded the presumption of innocence and that, in this case, if we were to reverse the post-conviction court, he would be "restored [to] the pre-trial presumption of innocence that he enjoyed prior to his trial attorney's inadequate and ineffective assistance of counsel." Further, petitioner asserts, defendant's contention makes "multiple impermissible assumptions," including that the admission would necessarily be admitted by the trial court and would necessarily be believed by the jury. Moreover, defendant assumes the unavailability of defenses to the charges. Put differently, post-trial evidence adduced by the state, namely, petitioner's "second-look hearing" admission, is subject to a range of due-process rights afforded to a criminal defendant.

We agree with petitioner. Although his admission—sworn before the trial court—would appear to pose insurmountable odds to achieve an acquittal on charges related to the killing of the victim, we cannot foresee the panoply of circumstances extant in a retrial of the charges against petitioner. Thus, we cannot conclude that petitioner's admission would, as a matter of law, mean that a new trial could have no practical effect, *i.e.*, that it would necessarily result in convictions for the charged crimes. Accordingly, our task here is confined to deciding whether the post-conviction court erred in determining that petitioner's trial counsel was not constitutionally inadequate by failing to object to the "natural and probable consequences" instruction.

B. *Petitioner's Claim of Inadequate Trial Counsel*

ORS 138.530(1)(a) provides for post-conviction relief when there has been a "substantial denial in the proceedings resulting in petitioner's conviction * * * of petitioner's rights under the Constitution of the United States, or under the Constitution of the State of Oregon, or both, and which denial rendered the conviction void." Article I, section 11, of the Oregon Constitution establishes the state constitutional right to adequate assistance of counsel, providing, in part, that, "[i]n all criminal prosecutions, the accused shall have the right * * * to be heard by himself and counsel." The Sixth Amendment to the United States Constitution establishes

the federal constitutional right to effective assistance of counsel, providing that, "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence." The Oregon Supreme Court has stated that, "although those provisions are 'worded differently,' they 'embody similar objectives.'" *Green v. Franke*, 357 Or 301, 311, 350 P3d 188 (2015) (quoting *Krummacher v. Gierloff*, 290 Or 867, 871, 627 P2d 458 (1981)).[3]

Under the Oregon Constitution, we proceed in two steps when determining whether a criminal defense attorney has inadequately assisted his or her client: A petitioner "must prove that his or her trial counsel failed to exercise reasonable professional skill and judgment and that, because of that failure, the petitioner suffered prejudice." *Pereida-Alba v. Coursey*, 356 Or 654, 661-62, 342 P3d 70 (2015). Counsel's preparation on the law must be "to the extent appropriate to the nature and complexity of the case," *Krummacher*, 290 Or at 875, and we "make every effort to evaluate a lawyer's conduct from the lawyer's perspective at the time, without the distorting effects of hindsight," *Lichau v. Baldwin*, 333 Or 350, 360, 39 P3d 851 (2002) (internal citations omitted). Moreover, we will not "second-guess a lawyer's tactical decisions in the name of the constitution unless those decisions reflect an absence or suspension of professional skill and judgment." *Gorham v. Thompson*, 332 Or 560, 567, 34 P3d 161 (2001). In sum,

> "[t]he constitution gives no defendant the right to a perfect defense—seldom does a lawyer walk away from a trial without thinking of something that might have been done differently or that he would have preferred to have avoided."

*Krummacher*, 290 Or at 875. As to prejudice, which is whether counsel's inadequate assistance "had a tendency to affect the result" of the trial, the Oregon Supreme Court recently elucidated that standard of prejudice in *Green*,

> "[W]here the effect of inadequate assistance of counsel on the outcome of a jury trial is at issue, it is inappropriate

---

[3] Because we ultimately conclude that petitioner's trial counsel was inadequate under Article I, section 11, we do not consider his ineffective assistance of counsel claim under the Sixth Amendment. *See Montez v. Czerniak*, 355 Or 1, 7 n 3, 322 P3d 487 (2014).

to use a 'probability' standard for assessing prejudice. Instead, because many different factors can affect the outcome of a jury trial, in that setting, the tendency to affect the outcome demands more than mere possibility, but less than probability. As the court stated in *Lichau*, the issue is whether trial counsel's acts or omissions 'could have tended to affect' the outcome of the case."

357 Or at 322-23 (quoting *Lichau*, 333 Or at 365 (emphasis omitted)).

## 1. *Reasonable professional skill and judgment*

With those standards in mind, we turn to the first prong of the inadequate assistance of counsel test under Article I, section 11, which inquires "whether petitioner demonstrated by a preponderance of the evidence that [counsel] failed to exercise reasonable professional skill and judgment." *Montez v. Czerniak*, 355 Or 1, 7, 322 P3d 487 (2014) (quoting *Lichau*, 333 Or at 359). Our review of the "post-conviction court's determinations is not open-ended." *Id.* at 8. We review such proceedings for legal error and are bound by the "post-conviction court's findings of historical fact if there is evidence in the record to support them." *Id.*

As noted, the petition for reconsideration relies on *Wade* as the change in the case law that provides the basis for reconsideration of our decision in petitioner's appeal of the post-conviction court's denial of relief. As noted earlier, the "natural and probable consequences" instruction was expressly rendered obsolete by the Supreme Court in *Lopez-Minjarez*, 350 Or 576. ORS 161.155[4] both creates and limits accomplice liability, and that liability requires "'the intent to promote or facilitate the commission of *the* crime.'"

---

[4] ORS 161.155 provides, in part:

"A person is criminally liable for the conduct of another person constituting a crime if:

"(1) The person is made criminally liable by the statute defining the crime; or

"(2) With the intent to promote or facilitate the commission of the crime the person:

"*****

"(b) Aids or abets or agrees or attempts to aid or abet such other person in planning or committing the crime[.]"

*Lopez-Minjarez*, 350 Or at 583 (quoting ORS 161.155 (emphasis in *Lopez-Minjarez*)). "[T]he legislature created accomplice liability only for the crime that a defendant intended to promote or facilitate, not for any additional crimes that might be considered the natural and probable consequences of that crime, regardless of the defendant's intent." *Id.* That is, the theory that the charged crime is a natural and probable consequence of any crime that a defendant aided in committing, without the requisite intent in doing so, "does not exist under ORS 161.155." *Id.* at 584.

Before the court's decision in *Lopez-Minjarez*, we decided *Anlauf*, in which "we reviewed the denial of a motion for judgment of acquittal where the defendant had participated with the codefendant in an assault, but the codefendant acted alone by carrying and displaying a knife while the defendant was withdrawing from the assault." *Wade*, 268 Or App at 383. Although in *Anlauf* we did not decide the viability of the "natural and probable consequences" *instruction*, we "characterized the case law as not supporting liability for the natural and probable consequences of separate acts committed by accomplices and also noted that any such theory was based on principles of accomplice liability that predated the adoption of the Criminal Code of 1971 and specifically, ORS 161.155." *Wade*, 268 Or App at 384.

At issue in *Wade* was whether the petitioner's trial counsel's failure to object to the "natural and probable consequences" instruction after *Anlauf* was decided and before *Lopez-Minjarez* was decided (the same posture as in this case) was a failure to exercise reasonable professional skill. There, the petitioner was involved in a robbery during which her boyfriend assaulted the victim with a hammer-like object and, on an accomplice liability theory, was convicted of multiple counts of first- and second-degree robbery and first-degree assault. *Wade*, 268 Or App at 375-76. The state argued to the jury that it was not required to find that the petitioner intentionally aided the assault; the jury had only to find that she intended to steal from the victim. *Id.* at 376-77. The state's argument was based on the "natural and probable consequences" instruction, which the trial court gave without objection from the petitioner's attorney.

The petitioner sought post-conviction relief, challenging the adequacy of her attorney for failing to object to the instruction. She presented an affidavit from an experienced criminal defense trial attorney opining that *Anlauf* "'was too important and significant a decision to have gone unread by any attorney representing a person charged as an accomplice.'" *Id.* at 385. The attorney also stated that the viability of the instruction as a correct statement of the law had been questioned on a "listserve" of Oregon criminal defense attorneys and that criminal defense attorneys had been "routinely objecting" to the instruction. *Id.* The defendant countered that it was not unreasonable for the petitioner's trial counsel to fail to anticipate *Lopez-Minjarez*. *Wade*, 268 Or App at 385. The post-conviction court granted relief, finding that the failure to object to the instruction was not a reasonable exercise of professional skill.

On appeal, the defendant argued that *Anlauf* was not relevant because it addressed sufficiency of the evidence and not the jury instruction. We disagreed and affirmed the judgment granting relief, concluding that "petitioner's counsel failed to exercise professional skill and judgment when he failed to object to the natural and probable consequences instruction." *Wade*, 268 Or App at 387. We added that

> "at the time of trial—in which petitioner was prosecuted on a theory of accomplice liability for all the charges against her yet the state adduced no evidence linking her directly to the hammer-like object or to participation in the assault or robbery of the victim—it was unreasonable for counsel not to question the correctness of the natural and probable consequences instruction."

*Id.* We also noted that "the record indicates that criminal defense attorneys generally were aware of *Anlauf* and had questioned the continued viability of the instruction in light of that decision." *Id.* at 388.

Furthermore, we also reasoned that, in *Lopez-Minjarez*, the Supreme Court did not "reverse course," as the defendant argued, but relied on the discrepancy between the instruction and the law. "Indeed, in reaching its holding, the court did not have to confront *any* appellate decision that had held that the natural and probable consequences instruction

was good law." *Wade*, 268 Or App at 386 (emphasis in original). Trial counsel's failure was not a failure to "anticipate" reversal in the law of accomplice liability, as argued by the defendant, but rather a failure to compare the instruction to the law of accomplice liability, which would have led counsel to *Anlauf. Wade*, 268 Or App at 383. A comparison would be required because "'[t]he task of a criminal defense attorney is to 'prepare himself on the law to the extent appropriate to the nature and complexity of the case.'" *Id.* at 387 (quoting *Krummacher*, 290 Or at 875).

Petitioner contends here—because his criminal trial also was held after *Anlauf* but before *Lopez-Minjarez*—that our holding in *Wade* requires us to reverse the determination of the post-conviction court. Defendant counters that, in *Wade*, we did not rely solely on the existence of *Anlauf* to conclude that the petitioner's counsel's performance was unreasonable, and notes that, in *Wade*, the criminal defense attorney who provided testimony for the petitioner had taken steps to make other attorneys aware of *Anlauf* and the problems with the instruction. Here, defendant points out, the post-conviction court made an express credibility finding that the attorneys who testified for petitioner had not tried cases in Josephine and Jackson Counties nor did they have experience with local practice there.[5] With that credibility finding, defendant contends, the remaining evidence was petitioner's trial counsel's affidavit stating that he "had no reason to believe that an objection to the jury instruction would have been successful, or that resulting changes to the instructions would have changed the jury verdicts." Moreover, defendant posits that petitioner's trial occurred only seven months after *Anlauf*, which was not enough time for attorneys to consider and discuss whether the instruction was problematic, whereas the underlying criminal trial in *Wade* occurred in 2006, six years after *Anlauf* was decided, which provided time for the criminal defense community to begin a dialogue about the instruction.

We are not persuaded by defendant's arguments. The post-conviction court's findings do not support its

---

[5] The case was before the Josephine County Circuit Court but tried in the Jackson County Courthouse.

determination that petitioner's attorney's performance was reasonable. To begin with, Sussman's familiarity with local practices and judges of Jackson and Josephine Counties has no bearing on the validity of his opinion that it was unreasonable of petitioner's trial attorney to fail to object to the "natural and probable consequences" instruction. The deficiency of the instruction was that it did not accurately reflect Oregon law, not that it did not comport with the rules or customs of the local trial courts. Moreover, whether an objection to the instruction would have been successful with a particular trial judge is also irrelevant; an objection would have, as Sussman pointed out, preserved the error, which, in this instance, would have likely yielded a reversible error on appeal, as happened in *Lopez-Minjarez*, 350 Or 576, and *State v. Lopez-Minjarez*, 236 Or App 270, 237 P3d 223, *adh'd to on recons*, 237 Or App 688, 240 P3d 753 (2010), *aff'd in part, rev'd in part by Lopez-Minjarez*, 350 Or 576, 260 P3d 439 (2011) (also concluding that the natural and probable consequences instruction does not accurately state Oregon law). *See also Anlauf*, 164 Or App at 678 (stating that the natural and probable consequences theory is contrary to Oregon law).

We are left, then, with the legal question whether the failure to object to the instruction was unreasonable. As we stated in *Wade*, the "task of a criminal defense attorney is to 'prepare himself on the law to the extent appropriate to the nature and complexity of the case.'" 268 Or App at 387 (quoting *Krummacher*, 290 Or at 875). Here, petitioner faced five counts of aggravated murder and murder, all extremely grave crimes with life imprisonment at stake. The state advanced an accomplice liability theory on four of the five counts and, as amplified in our discussion of whether the failure to object prejudiced petitioner, the state's theory relieved the jury of the requirement to find an element of four of the five charged crimes—whether petitioner intended to kill or intended to aid in killing the victim.

As the Supreme Court stated in *Lopez-Minjarez*, the "natural and probable consequences" instruction was not the law of accomplice liability:

> "The fact that the erroneous instruction is part of the Uniform Criminal Jury Instructions, of course, is inconsequential in the analysis. Those uniform instructions are drafted by a committee of members of the Oregon State Bar and are not themselves the law. They instead are a salutary effort on the part of legal practitioners in Oregon to state the law in a correct way that is helpful to jurors. As this case demonstrates, that effort does not always succeed."

350 Or at 583 n 4. Petitioner's attorney failed to compare the uniform instruction—drafted by a Bar committee intending to aid practitioners—to the law of accomplice liability in a manner that would have led to the discovery of *Anlauf.* Although *Anlauf* did not explicitly render the *instruction* obsolete (an issue we were not called upon to decide), we did establish that the erroneous accomplice liability *theory*—that a defendant who participates in one crime is necessarily responsible as an accomplice for other crimes that were the natural and probable consequences of the intended predicate crime—was not supported by statutes or case law. 164 Or App at 678. That erroneous theory was relied on by the state in this case and was reflected in the instruction. To be sure, in *Wade,* the post-conviction court found relevant the evidence that, shortly before the petitioner's criminal trial, the criminal defense bar had discussed *Anlauf* and the instruction. But a "listserve" discussion was not essential to our conclusion in *Wade* that the post-conviction court correctly decided that trial counsel's performance was unreasonable. Moreover, we cannot conclude that trial counsel was excused from researching the relevant law of accomplice liability because the broader criminal defense bar had not yet had time to absorb the impact of *Anlauf* on the viability of the instruction. *Anlauf* was decided six months before petitioner's trial; nothing prevented counsel from discovering the decision in preparing for a trial heavily dependent on a theory of accomplice liability.[6]

For the above reasons, we conclude, as we did in *Wade,* that petitioner's trial counsel's failure to object to the

---

[6] By contrast, in *Eklof v. Steward,* 273 Or App 789, 792 n 2, 793, 359 P3d 570 (2015), we established that, under *Hale v. Belleque,* 255 Or App 653, 298 P3d 596, *adh'd to on recons,* 258 Or App 587, 312 P3d 533, *rev den,* 354 Or 597 (2013), as a matter of law, counsel is not inadequate for failing to object to the "natural and probable consequences" instruction if a petitioner's trial occurred before *Anlauf* was decided.

"natural and probable consequences" instruction was not a reasonable exercise of professional skill.

## 2. *Prejudice*

Having concluded that the first prong of petitioner's inadequacy of counsel claim is satisfied, we turn to the second prong, whether the failure to object to the instruction prejudiced petitioner. For that inquiry, under the state constitution, the question is whether "trial counsel's acts or omission 'could have tended to affect' the outcome of the case." *Green*, 357 Or at 303 (quoting *Lichau*, 333 Or at 365).

Defendant asserts that the record fails to show that the "natural and probable consequences" instruction was "pivotal" to finding petitioner guilty. In defendant's view, Haynes's testimony relating petitioner's statements recounting his role in shooting the victim and petitioner's statement to police that his brother was not involved in the crimes meant that, without the instruction, "the jury may well have arrived at the same conclusion based on the evidence." That view echoes the post-conviction court's determination that the evidence in petitioner's trial tying him to the shooting was much less tenuous than the evidence in *Lopez-Minjarez* and *Anlauf*. Further, the post-conviction court found that there was only "brief mention" of the erroneous instruction and that "the prosecutor never suggested that [p]etitioner could be found guilty without a requisite finding that he was intentionally involved in all aspects of the crime."

Defendant's suggestion that the "natural and probable consequences" instruction was incidental to the state's presentation of its case is not supported by the record. *First,* the prosecutor in closing arguments informed the jury that all of the counts except aggravated felony murder were based on aiding and abetting. *Second,* the prosecutor told the jurors that, if they were satisfied that both petitioner and his brother "intended that this armed robbery took place, then it doesn't matter if anyone intended for [the victim] to die or not." *Third,* the prosecutor explained to jurors that, even if they found that petitioner did not personally shoot the victim, it was sufficient to find him guilty of Counts 1, 2, 4, and 5 if petitioner, among other things, "simply participated in the armed robbery" and "stood by during the actual act of

homicide." *Fourth*, for Counts 1, 2, and 5, the prosecutor stated to the jurors that the only intent that they had to find was "the intent to commit robbery in the first degree." *Fifth*, the prosecutor discounted the importance (except as to Count 3, the aggravated felony murder count) of Haynes's testimony by noting that, of the adduced evidence, Haynes's testimony comprised only two of the 29 items of evidence supporting a guilty verdict. *Sixth*, it was petitioner's brother's gun that was the likely murder weapon, and the state left open the possibility that the brother was the shooter. Hence, the crux of the state's theory of the case was that the evidence overwhelmingly proved that both brothers were involved in the armed robbery and that, although the state presented evidence that petitioner was the shooter, it did not matter if he was not the shooter because the jury did not have to find that the petitioner intended the killing of the victim.

Given all of that, we conclude, as to Counts 1 and 2, the aggravated murder convictions, and Count 5, the murder conviction, all of which were prosecuted on an accomplice liability theory (in addition to direct liability), that the giving of the instruction could have had a tendency to affect the result of the prosecution. That is, the state's theory of the case and the erroneous instruction allowed the jurors to find petitioner guilty of aggravated murder and intentional murder on an accomplice liability theory without finding that petitioner intended to aid the killing of the victim—an outcome in contravention of ORS 161.155. For example, the jury could have found Haynes's testimony not credible but could nevertheless have convicted petitioner of aggravated murder or intentional murder based on its conclusion that petitioner was involved in the armed robbery. Our conclusion finds further support because the jury was unable to unanimously agree that petitioner was guilty of the one charge—Count 3, aggravated felony murder—which required the jury to find that petitioner intentionally killed the victim and which the state did not prosecute based on an accomplice liability theory.

As to Count 4, the felony murder conviction, defendant argues, correctly, that petitioner was not prejudiced by the instruction. That is so because, for felony murder, ORS 163.115, the requisite element of intent for murder

committed by another person is established as a matter of law if the murder is in furtherance of a number of statutorily identified felony crimes, ORS 163.115(1)(b)(A) - (J). *See State v. Blair*, 348 Or 72, 80, 228 P3d 564 (2010) ("(1) [U]nder ORS 163.005(1), 'criminal homicide' requires that a defendant act with a culpable *mens rea* with respect to causing the victim's death; (2) under ORS 163.005(2), 'criminal homicide' includes 'murder,' and (3) under ORS 163.115(1)(b), requisite culpable *mens rea* is established, as a matter of law, by the defendant's commission or attempted commission of the predicate felony."). Although felony murder and the theory of natural and probable consequences are similar in that neither theory of criminal liability requires a finding of the intent for the crime that occurs after a predicate crime, for felony murder, if the defendant withdraws from the underlying felony, a jury may not find that the defendant committed felony murder. *Lopez-Minjarez*, 350 Or at 590-91. Here, the element of withdrawal from the armed robbery is not at issue. Therefore, the erroneous instruction did not affect petitioner's felony murder conviction because the evidence would have permitted the jury to find that a participant in the armed robbery (either petitioner or his brother) caused the victim's death in the course of and in furtherance of that predicate felony.

Consequently, we allow petitioner's petition for reconsideration because, as we held in *Wade*, petitioner's counsel's failure to object to the erroneous "natural and probable consequences" instruction was not an exercise of reasonable professional skill and, as to his convictions for aggravated murder and intentional murder, Counts 1, 2, and 5, that failure to object was prejudicial. Therefore, the post-conviction court's denial of petitioner's claim of inadequate assistance of counsel was error. However, the failure to object to the instruction was not prejudicial as to the felony murder conviction, Count 4. Accordingly, we withdraw our former disposition and reverse and remand for the post-conviction court to grant petitioner relief on Counts 1, 2, and 5.

Reconsideration allowed; former disposition withdrawn; reversed and remanded with instructions for post-conviction court to grant petitioner relief on Counts 1, 2, and 5; otherwise affirmed.